RUDOLPH DELGUIDICE, JR., APPELLANT, v. NEW JERSEY
RACING COMMISSION, RESPONDENT.

Argued April 23, 1985—Decided July 17, 1985.

*William L. Bowe* argued the cause for appellant.

*Steven D. Wallach,* Deputy Attorney General, argued the
cause for respondent (*Irwin I. Kimmelman,* Attorney General
of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney

General, of counsel; *Gale P. Simon,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

We granted certification, 99 *N.J.* 175 (1984), to determine whether the New Jersey Racing Commission can consider, in a licensing hearing, evidence obtained by law-enforcement officials through illegal means. Appellant had been charged in a criminal indictment that was dismissed on grounds of entrapment. Thereafter, the Racing Commission refused to relicense appellant as a jockey. In reaching its determination the Racing Commission relied on evidence that had been gathered in the criminal investigation. The Appellate Division affirmed the Racing Commission's order, in an unreported opinion. We now affirm.

I

Appellant, Rudolph Delguidice, was a licensed jockey in New Jersey. In the spring of 1981, the New Jersey State Police commenced "Operation Glue," an undercover investigation targeted at jockeys involved in fixing races. State Police officers posing as horse owners sought jockeys who were willing to accept bribes to hold back horses in races.

During the same time period horse owner and trainer Burton Sipp was under investigation by a State grand jury for his alleged involvement in the improper scratching of a racehorse at the Atlantic City racetrack in August of 1980. In exchange for termination of this criminal investigation, Sipp agreed to aid the State Police by providing a number of his horses for use in "Operation Glue." The Racing Commission was unaware of the agreement between Sipp and the State Police. In fact, the Commission knew nothing at all about "Operation Glue" until after indictments were handed up at the conclusion of the investigation.

On November 16, 1981, two state police detectives representing themselves as the owner and trainer of a horse named Star Trader approached Delguidice at the Meadowlands Racetrack and asked him to ride their horse the following day. They requested that Delguidice so guide Star Trader as to have the horse "come in as far back as possible * * * without anybody looking at you." In response, Delguidice boasted that recently he had successfully held back a horse in Chicago, and he agreed to "get [Star Trader] beat by about 8 to 10 lengths." He requested $400 for this nefarious bit of artistry. The agents assented, paid him $200 in advance, and promised to pay the balance after the race. Before the running, however, the agents instructed Delguidice to ignore their earlier request and to race the horse to win. Although Star Trader was ultimately scratched from the race, the parties agreed to do business on a later occasion.

These conversations, tape-recorded by the undercover detectives, provided the basis for a criminal prosecution against Delguidice. He was indicted for conspiracy to rig a publicly-exhibited contest in violation of *N.J.S.A.* 2C:5-2 and *N.J.S.A.* 2C:21-11, and for agreeing to accept a benefit for rigging a publicly-exhibited contest contrary to *N.J.S.A.* 2C:21-11b. The Racing Commission suspended Delguidice's jockey license pending determination of the indictments.

In October 1982 criminal proceedings were commenced in the Superior Court, Law Division. The court granted defendant's pretrial motion to dismiss all criminal charges on the grounds that the actions of the State Police were sufficiently improper as to warrant a finding of entrapment. In essence what troubled the court was that rather than infiltrate and expose any existing patterns of race fixing, the State had manufactured its own criminal enterprise.

After the criminal indictments were dismissed, the Racing Commission notified Delguidice that it "contemplate[d] reviewing [his] standing in this jurisdiction * * * " and that it would

"also be consulting with the New Jersey Division of Criminal Justice and the New Jersey State Police Racetrack Unit to review the circumstances and facts giving rise to the criminal charges" lodged against him. Shortly thereafter, and apparently following its review of the transcripts of recorded conversations between appellant and the undercover operatives, the Racing Commission notified Delguidice that it would "not favorably entertain any application on [his] part to be licensed in any capacity in 1983." The Racing Commission concluded that Delguidice had accepted a bribe to influence the result of a race, in violation of *N.J.A.C.* 13:70–14.2; had conspired to commit a fraudulent practice in relation to racing, contrary to *N.J.A.C.* 13:70–14.8; and lacked the degree of integrity necessary to be licensed by the Racing Commission, as required by *N.J.A.C.* 13:70–4.7.

Appellant requested and was granted a formal hearing before the Racing Commission pursuant to *N.J.S.A.* 5:5–52 to contest the denial of his jockey license. At the hearing the Racing Commission considered all relevant evidence, including evidence obtained by the State Police during "Operation Glue." Delguidice objected to the use of any evidence relating to the undercover operation. The Racing Commission, however, admitted the challenged evidence and affirmed its earlier decision to deny appellant a license. There can be little doubt that the decision was based principally, if not entirely, on the evidence collected during "Operation Glue."

Delguidice appealed from the Racing Commission's decision, claiming that because the covert police investigation had been characterized in the criminal proceedings as offensive to principles of fairness, all evidence relating to the dismissed criminal indictments should have been excluded from the licensing hearing. The Appellate Division disagreed, concluding that because the Racing Commission had not been involved in "Operation Glue," it was proper for it to consider all of the evidence, and exclusion of the challenged tape-recorded conversations would have no substantial deterrent effect upon future unlawful po-

lice conduct. *See United States v. Janis,* 428 *U.S.* 433, 446, 96 *S.Ct.* 3021, 3028, 49 *L.Ed.*2d 1046, 1056 (1976).

## II

As a preliminary observation we emphasize that inasmuch as the State chose not to challenge dismissal of the earlier criminal charges, we do not dwell on whether the Law Division's ruling on entrapment was correct as applied to appellant (the Law Division's opinion dismissed identical indictments against two other defendants as well as the indictment against appellant). Arguably it was not. The more audacious aspects of "Operation Glue" did not involve appellant. Moreover, the New Jersey Code of Criminal Justice (Code), at *N.J.S.A.* 2C:1–12, "modified the prior law of entrapment * * * to require both that the police conduct created a substantial risk that the crime would be committed by people who were not predisposed to commit it and that it caused the particular defendant to commit the crime." *State v. Rockholt,* 96 *N.J.* 570, 577 (1984). The Code provided in addition that "both the subjective and objective aspects of entrapment are to be decided by the trier of fact." *Id.* Although the ruling on entrapment in the criminal proceedings against appellant may be vulnerable in the face of the above-stated provisions of the Code, we pass the point to address the single issue posed in the petition for certification, namely, whether the Racing Commission, in a licensing hearing, can "consider evidence obtained as a result of a fundamentally unfair and illegal entrapment scheme operated by the State * * *." As appellant took pains to emphasize at oral argument, the issue he raises is *not* whether he was entitled to urge an entrapment defense before the Racing Commission but rather whether the evidence that had been found to have been secured in a fundamentally unfair way could be used before that body. Hence, the sole issue on which the appeal is based is couched in terms of a rule of exclusion of evidence.

## III

█ We start with the proposition that in an administrative hearing, unlike a criminal trial, all relevant evidence is admissible. *N.J.A.C.* 1:1–15.2(a). This difference is explained in part by the varying goals of the two proceedings: whereas the former is penal, the latter is regulatory. The Racing Commission's purpose is not to punish wrongdoers but rather to regulate the racing industry and to protect the public interest. Suffice it to say that the record indicates that the proceedings before the Racing Commission were limited to the licensing eligibility of appellant; at no time did the licensing authority attempt to prosecute Delguidice for any offenses that carried imprisonment as a possible sanction upon a finding of guilt.

The United States Supreme Court has exercised caution in extending application of the exclusionary rule. It has restricted the rule's use "to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra,* 414 *U.S.* 338, 348, 94 *S.Ct.* 613, 620, 38 *L.Ed.*2d 561, 571 (1974); *United States v. Janis, supra,* 428 *U.S.* at 453–54, 96 *S.Ct.* at 3031–32, 49 *L.Ed.*2d at 1060; *cf. United States v. Leon,* 468 *U.S.* ——, 104 *S.Ct.* 3405, 82 *L.Ed.*2d 677 (1984) (exclusionary rule not applied when police officers acted in reasonably-objective, good-faith reliance on warrant that was subsequently determined invalid). Thus it has been held that application of the exclusionary rule is inappropriate in a federal civil tax proceeding following the unlawful seizure of evidence by state police and exclusion of such evidence at the state criminal trial. *United States v. Janis, supra,* 428 *U.S.* 433, 96 *S.Ct.* 3021, 49 *L.Ed.*2d 1046.

After *Janis* the Second Circuit Court of Appeals extended the ruling of that case to situations involving different agencies of the same sovereign. See *Tirado v. Commissioner of Internal Revenue,* 689 *F.*2d 307 (2d Cir.1982), in which evidence that was illegally seized by federal narcotics agents was admitted for use in a federal tax proceeding. Most recently, the Supreme

Court has held that evidence obtained as a result of allegedly illegal arrest procedures would not be excluded from a civil deportation hearing. *Immigration and Naturalization Serv. v. Lopez-Mendoza*, 468 *U.S.* ——, 104 *S.Ct.* 3479, 82 *L.Ed.*2d 778 (1984). In *Lopez-Mendoza* the Court ruled that the exclusionary rule would not apply despite the fact that the same agency that had effected the unlawful arrest was also responsible for instituting the subsequent deportation action. *Id.* at ——, 104 *S.Ct.* at 3486, 82 *L.Ed.*2d at 788.

*United States v. Janis, supra*, 428 *U.S.* 433, 96 *S.Ct.* 3021, 49 *L.Ed.*2d 1046, provides the framework for deciding in what types of proceedings application of the exclusionary rule is appropriate. *Lopez-Mendoza, supra*, 468 *U.S.* at ——, 104 *S.Ct.* at 3485, 82 *L.Ed.*2d at 787. The *Janis* Court set forth a balancing test, whereby the likely social benefits of excluding evidence are weighed against the likely social costs resulting from exclusion. *Id.* So here we must examine the policies supporting the exclusionary rule and determine whether the rule's objective would be "efficaciously served," *Calandra, supra*, 414 *U.S.* at 348, 94 *S.Ct.* at 620, 38 *L.Ed.*2d at 571; *Janis, supra*, 428 *U.S.* at 454 n. 28, 96 *S.Ct.* at 3032 n. 28, 49 *L.Ed.*2d at 1060 n. 28, by excluding the evidence presented to the Racing Commission.

Deterrence of future unlawful police conduct is the "prime purpose" of the exclusionary rule, "if not the sole one." *Lopez-Mendoza, supra*, 468 *U.S.* at ——, 104 *S.Ct.* at 3486, 82 *L.Ed.*2d at 787, citing *Janis, supra*, 428 *U.S.* at 446, 96 *S.Ct.* at 3028, 49 *L.Ed.*2d at 1056, and *Calandra, supra*, 414 *U.S.* at 347, 94 *S.Ct.* at 619, 38 *L.Ed.*2d at 571.[1] It follows that the

---

[1]Those decisions have not evoked a uniform response from the Justices of the Supreme Court. But even were the rationale of the dissenters to be applied, one would conclude that the administrative use of the gathered evidence does not offend constitutional principles. Here we perceive "no taint of partnership in official lawlessness," avoidance of which is a rationale for the exclusionary rule exclusive of its deterrent effect, *United States v. Calandra,*

Court must first determine the identity of the agency to be deterred. *Janis, supra,* 428 *U.S.* at 448, 96 *S.Ct.* at 3029, 49 *L.Ed.*2d at 1057.

 Appellant argues that because the Division of State Police is the law-enforcement arm of the Racing Commission, *N.J.A.C.* 13:71–23.13, those entities should be considered as one for the purpose of deterring future improprieties. Although it is undisputed that the State Police are responsible for enforcing the criminal provisions of the racing statutes, that is hardly a sufficient basis for destroying the independent identities of the two state agencies. From a strictly structural perspective, the Racing Commission and the State Police are governed by different statutes. See *N.J.S.A.* 5:5–22 and *N.J.S.A.* 53:1–1. Additionally, although *N.J.A.C.* 13:71–23.13 provides that the responsibilities of the State Police include the enforcement of the criminal laws related to racing, the same Administrative Code section specifies not only that Racing Commission officials must cooperate in any criminal investigation, but that criminal investigations take precedence over any actions of the Racing Commission arising out of the same incident. Certainly, such directives would be unnecessary if the Racing Commission and the State Police operated as a single investigative body.

Moreover, we note that the factual circumstances serve to defeat appellant's suggestion that the Racing Commission and the State Police should be considered as one. The State Police conducted the "Operation Glue" investigation at the direction of the Division of Criminal Justice, without the knowledge or approval of the Racing Commission. There was no collusion or

---

*supra,* 414 *U.S.* at 357, 94 *S.Ct.* at 624, 38 *L.Ed.*2d at 576 (Brennan, J., dissenting); or any "pattern of mutual cooperation and coordination" that would link the two investigations. *United States v. Janis, supra,* 428 *U.S.* at 461, 96 *S.Ct.* at 3035, 49 *L.Ed.*2d at 1065 (Stewart, J., dissenting); *see also INS v. Lopez-Mendoza, supra,* 468 *U.S.* at ——, 104 *S.Ct.* at 3491, 82 *L.Ed.*2d at 794 (White, J., dissenting) (applying *Janis* principles he concludes that exclusionary rule should apply since deportation proceedings were not "collateral" to the unlawful evidence gathering).

agreement between the undercover officers and Racing Commission officials. As noted earlier, the Racing Commission was entirely in the dark as to any undercover investigation until after indictments were handed up at the conclusion of "Operation Glue." Finally, the record indicates that although the State Police granted total immunity from criminal prosecution to horse owner Burton Sipp in exchange for his assistance in "Operation Glue," the Racing Commission chose to punish Sipp with a sixty-day suspension for his violation of its regulations. The foregoing factors clearly indicate that the Racing Commission is an entity wholly independent of and distinct from its law enforcement agency, the State Police. In the absence of any showing of Racing Commission involvement, we refuse to impute to it any errors of the State Police.

Having identified the State Police investigators as the sole offending officials, we must next determine whether excluding the fruits of "Operation Glue" from the Racing Commission's license-revocation hearing would have a substantial deterrent effect on future police conduct. A number of factors suggest that imposition of an exclusionary sanction would have little value as a deterrent.

First, the fact that the Racing Commission was not involved in "Operation Glue" takes on added significance in this context. The record reveals absolutely no connection between the police entrapment and the Racing Commission. As noted in *Janis, supra,* 428 *U.S.* at 458, 96 *S.Ct.* at 3034, 49 *L.Ed.*2d at 1062–63, the deterrent effect of excluding evidence is highly attenuated when the entity forbidden from using the evidence is not the same entity whose agents engaged in the illegal maneuvers.

Second, the State Police have already been deterred from committing future acts of entrapment by reason of the Law Division's dismissal of all criminal indictments related to "Operation Glue." That result has to be of substantial concern to the police. Extending the exclusionary sanction to the subsequent licensing proceeding would have, at best, only a marginal

deterrent effect. *Janis, supra,* 428 *U.S.* at 448, 96 *S.Ct.* at 3029, 49 *L.Ed.*2d at 1057.

In addition, the Division of Criminal Justice designed and implemented "Operation Glue" in order to obtain criminal convictions, not to secure license revocations. As "Operation Glue" concerned itself with criminal prosecutions, the license-revocation proceedings were not within the participating officers' "zone of primary interest". *Janis, supra,* 428 *U.S.* at 458, 96 *S.Ct.* at 3034, 49 *L.Ed.*2d at 1063. Although the offending officers could probably foresee the use of the fruits of "Operation Glue" in a subsequent licensing or disciplinary hearing, see *City of New Brunswick v. Speights,* 157 *N.J.Super.* 9, 20–21 (Cty.Ct.1978), there is nothing to suggest that the officers were actively motivated—and it is unlikely that they were—to assist the Racing Commission in its regulatory functions at the expense of forfeiting all criminal indictments. The foregoing factors convince us that extending the exclusionary rule to prevent the Racing Commission from considering the tainted evidence in these circumstances "is unlikely to provide significant, much less substantial, additional deterrence." *Janis, supra,* 428 *U.S.* at 458, 96 *S.Ct.* at 3034, 49 *L.Ed.*2d at 1063.

Appellant argues for exclusion of the evidence in the interest of "judicial integrity." He contends that whereas the primary reason for exclusion in the Fourth Amendment context is deterrence of illegal police activity, in the entrapment context the illegally-obtained evidence should be excluded to vindicate judicial integrity, that is, to avoid the courts' tacit participation in or approval of the wrongful activity.

Part of the answer to that contention is found in *Janis,* which makes the point that judicial integrity does not require that the courts must never admit evidence that has been wrongfully obtained. *Janis, supra,* 438 *U.S.* at 458 n. 35, 96 *S.Ct.* at 3034 n. 35, 49 *L.Ed.*2d at 1063 n. 35. "The requirement that a defendant must have standing to make a motion to suppress demonstrates as much." *Id.,* citing *Alderman v. United*

*States,* 394 *U.S.* 165, 89 *S.Ct.* 961, 22 *L.Ed.*2d 176 (1969). Although the Supreme Court has declared that the primary meaning of "judicial integrity" in the context of evidentiary rules is that the courts must not commit or encourage violations of the constitution, *id.,* here—as is likewise almost always true with Fourth Amendment violations—the evidence is unquestionably accurate and the wrong is complete by the time the evidence reaches the court. *Id.* Therefore, the analysis is narrowed to the question of whether admitting the evidence would encourage future improper law-enforcement actions. As noted by the *Janis* Court, this inquiry is substantially the same as the question of whether exclusion would serve a deterrent purpose. 428 *U.S.* at 458 n. 35, 96 *S.Ct.* at 3034 n. 35, 49 *L.Ed.* 2d at 1063 n. 35; *see United States v. Peltier,* 422 *U.S.* 531, 538, 95 *S.Ct.* 2313, 2317, 45 *L.Ed.*2d 374, 381–82 (1975); *Michigan v. Tucker,* 417 *U.S.* 433, 450 n. 25, 94 *S.Ct.* 2357, 2367 n. 25, 41 *L.Ed.*2d 182, 196 n. 25 (1974). As we have previously demonstrated, the goal of obtaining license revocations is simply not important enough to the State Police to encourage them to employ improper law enforcement techniques and gather evidence that cannot be used in criminal proceedings. *Accord Janis, supra,* 428 *U.S.* at 458 n. 35, 96 *S.Ct.* at 3034 n. 35, 49 *L.Ed.*2d at 1063 n. 35.

It is important that we not ignore the tremendous social cost of excluding the challenged evidence in these circumstances. *See Lopez-Mendoza, supra,* 468 *U.S.* at ——, 104 *S.Ct.* at 3485, 82 *L.Ed.*2d at 787; *Janis, supra,* 428 *U.S.* at 453–54, 96 *S.Ct.* at 3031–32, 49 *L.Ed.*2d at 1060–61. There is no question that imposition of exclusionary sanctions almost invariably renders concededly relevant and reliable evidence unavailable for purposes of enforcing valid laws and regulations. *Janis, supra,* 428 *U.S.* at 447, 96 *S.Ct.* at 3028, 49 *L.Ed.*2d at 1057; *see Lopez-Mendoza, supra,* 468 *U.S.* at ——, 104 *S.Ct.* at 3485, 82 *L.Ed.*2d at 787. That is undoubtedly the situation here, as the Racing Commission's decision not to renew Delguidice's license turned on consideration of the challenged evidence. Without

that evidence the Racing Commission would be completely stymied in fulfilling its solemn obligation to ensure the public's confidence in the integrity of racing procedures in New Jersey.

> The danger of clandestine and dishonest activity inherent in the business of horse racing has been well recognized. The business itself and the legalized gambling which accompanies its activities are strongly affected by a public interest. Corruption in horse racing activities is regarded as an affront to a publicly sponsored sport with the potential of far reaching consequences. Strict and close regulation is therefore regarded as highly appropriate. [*Dare v. State*, 159 *N.J.Super.* 533, 536–37 (App.Div.1978) (citations omitted).]

It was doubtless with these important considerations in mind that the legislature gave the Racing Commission full regulatory power over horse racing in this state. *State v. Dolce*, 178 *N.J.Super.* 275, 285 (App.Div.1981); *N.J.S.A.* 5:5–22 to 5:5–109. In particular, the Racing Commission is empowered to prescribe the rules, regulations, and conditions under which all horse races are conducted, *N.J.S.A.* 5:5–30, and to regulate the licensing of those connected with horse racing, *N.J.S.A.* 5:5–33. Furthermore, the State has a vital interest in maintaining the integrity of the horse-racing industry. *Dolce, supra,* 178 *N.J. Super.* at 284. Towards that end, *N.J.S.A.* 5:5–33 imposes on the Racing Commission a statutory obligation "to revoke or refuse to issue a license if in the opinion of the Commission the revocation or refusal to issue such license is in the public interest * * *."

In dismissing all criminal charges against Delguidice, the Law Division concluded that the circumstances added up to entrapment. The Code was in effect at the time of the offenses referred to in the indictment. One of the Code requirements is that the defendant must prove that "the police conduct constituted an inducement to crime by objective standards or, in the Code's terms, that the conduct by its nature created a 'substantial risk' that the crime would be committed by an average person who was not otherwise ready to commit it." *Rockholt, supra,* 96 *N.J.* at 581. Although the Racing Commission was not at liberty to conclude that defendant had not been entrapped, and although the judicial system could not coun-

tenance a criminal prosecution in the face of a judicial determination of entrapment, there is no reason rooted in judicial integrity why that regulatory body should be required to close its eyes to the evidence on which the judicial declaration was based—rightly or wrongly. We therefore hold that in the context of a civil licensing or other regulatory proceeding before an agency that is separate and apart from the one that originally obtained the evidence, a defendant cannot complain that relevant, credible information ought to be excluded as a matter of law.

Moreover, there is every reason grounded in the public interest why, in this licensing procedure, the evidence should have been considered. That evidence suggests that when the undercover agents approached appellant, he was already willing—even eager—to engage in the fixing of races. He did not need any persuasion to become a participant in the scheme. Confronted with such a blatant disregard for its rules and regulations, the Racing Commission concluded that it would be contrary to the public interest to relicense Delguidice as a jockey in New Jersey for the year 1983.

Surely the public interest is not served when fraudulent practices related to racing go unpunished. The immediate result of excluding relevant, reliable evidence here would be to put back in the saddle at New Jersey racetracks a jockey who has demonstrated a willingness to defraud the wagering public. The harm to the racing industry would be enormous. There would be a shadow cast on the ability of the Racing Commission to safeguard the public from fraud. Allowing appellant to return to racing without penalty would undoubtedly undermine public confidence in the integrity of racing in New Jersey. We doubt that without the trust of the public the racing industry can long survive, much less enjoy the success it has known in the past.

In short, we find that high social costs are associated with exclusion of the challenged evidence. Conversely, there is no

realistic prospect of achieving marginal deterrent benefits by preventing the Racing Commission from considering the fruits of "Operation Glue." Therefore, we apply the *Janis* balancing test and hold that under the circumstances before us, the Law Division's finding of entrapment and dismissal of criminal proceedings should not prevent the use of the incriminating evidence in appellant's licensing hearing before the Racing Commission.

There comes a point at which courts, consistent with their duty to administer the law, cannot continue to create barriers to law enforcement in the pursuit of a supervisory role that is properly the duty of executive and legislative branches. We find ourselves at that point in this case.

[*Janis, supra,* 428 *U.S.* at 459, 96 *S.Ct.* at 3034, 49 *L.Ed.*2d at 1063–64.]

Judgment affirmed.

*For Affirmance* —Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal*—None.