STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MICHAEL STRONG, DEFENDANT–APPELLANT.

Argued October 27, 1987—Decided June 16, 1988.

*James H. Klein*, Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum*, Public Defender, attorney).

*Jack L. Weinberg*, Assistant Prosecutor, argued the cause for respondent (*Samuel Asbell*, Camden County Prosecutor, attorney).

*Catherine M. Langlois* submitted a brief on behalf of *amicus curiae*, American Civil Liberties Union of New Jersey.

The opinion of the Court was delivered by

HANDLER, J.

This appeal requires the Court to determine the scope of the limited immunity from prosecution under *N.J.S.A.* 2A:81–17.3. This prohibits the State from using evidence against a person that is "directly or indirectly derived" from his own compelled testimony.[1] Defendant, Michael Strong, contends that he was indicted on evidence derived from testimony that he was compelled to give in exchange for a grant of limited immunity

---

[1] *N.J.S.A.* 2A:81–17.3 prohibits the prosecutor from using
testimony or evidence, or any information directly or indirectly derived from such testimony or evidence, ... against the person in any proceeding or prosecution for a crime or offense concerning which he gave answer or produced evidence under court order.

under this statute. This, he claims, violates his right not to incriminate himself as guaranteed by both the fifth amendment to the Federal Constitution and the privilege against self-incrimination under state law.

## I.

The case originated with a robbery murder on the streets of Camden on February 20, 1981. Theodore Custis, Christopher Watson, and defendant were arrested a few blocks from the scene of the crime shortly after its commission. In the course of the investigation that followed, the prosecutor, having determined that the evidence against Strong was not sufficient, decided to obtain and use Strong's testimony against the other suspects. As required by *N.J.S.A.* 2A:81-17.3, the prosecutor applied to the Attorney General for an order requiring Strong to testify against Custis and Watson under immunity. This application was granted, and, pursuant to the order compelling immunized testimony, Strong gave a statement before a grand jury on April 7, 1981. He described the events of the crime and provided incriminating testimony against Custis and Watson. He also acknowledged his own participation in the crime. Later, during the trial of Watson, Strong testified for the State under the continuing grant of immunity and again incriminated himself as well as Watson. Watson was convicted on October 20, 1981.

One year later defendant himself was indicted for murder. He moved to dismiss the indictment on the ground that it was based on evidence derived from his earlier compelled testimony and therefore violated the statutory immunity under which he had testified both before the grand jury and at Watson's trial. The trial court disagreed with his contention, holding that the evidence on which the indictment was based had been gained through means that were independent of Strong's compelled testimony. Accordingly, the court denied Strong's motion to dismiss the indictment.

Thereafter, defendant pled guilty to the indictment, reserving the right to appeal from the order denying the motion to dismiss. In an unpublished *per curiam* decision, the Appellate Division affirmed the trial court's holding. We granted defendant's petition for certification. 108 *N.J.* 567 (1987).

## II.

The issue posed by this appeal must be analyzed in a framework that relates the privilege against self-incrimination to State attempts to compel incriminating testimony. This analysis is facilitated by a consideration of the different possible forms of immunity from prosecution or other penal sanctions that can be offered in exchange for government compelled testimony in order to vindicate the privilege against self-incrimination.

Historically the least protective form of immunity from criminal sanctions offered in exchange for compelled testimony has been simple "use" immunity. This form of immunity protects against the use in a subsequent prosecution of the actual statement made or evidence provided under compulsion; it furnishes a prosecutorial bar against only the "direct" use of compelled testimony. While this form of immunity was commonly provided, in *Counselman v. Hitchcock*, 142 *U.S.* 547, 12 *S.Ct.* 195, 35 *L.Ed.* 1110 (1892), the Supreme Court specifically invalidated a statute providing only direct-use immunity because it was not considered sufficiently protective of the privilege against self-incrimination. *Id.* at 562–67, 585, 12 *S.Ct.* at 197–200, 206, 35 *L.Ed.* at 1114–115, 1122.

Following *Counselman*, it was generally believed that only the broadest form of protective immunity would be constitutionally tolerated. *See, e.g., United States v. Murdock*, 284 *U.S.* 141, 149, 52 *S.Ct.* 63, 64, 76 *L.Ed.* 210, 213 (1931), overruled on unrelated grounds, *Murphy v. Waterfront Comm'n*, 378 *U.S.* 52, 84 *S.Ct.* 1594, 12 *L.Ed.*2d 678 (1964); *Hale v. Henkel*, 201

*U.S.* 43, 67, 26 *S.Ct.* 370, 376, 50 *L.Ed.* 652, 662 (1906). This broad form is "transactional immunity," which, in effect, "operate[s] as a complete pardon for the offense to which [the compelled testimony] relates[.]" *Brown v. Walker,* 161 *U.S.* 591, 595, 16 *S.Ct.* 644, 646, 40 *L.Ed.* 819, 820 (1896). In the years after *Counselman* this broader immunity was specifically upheld by the Supreme Court. *Ullmann v. United States,* 350 *U.S.* 422, 76 *S.Ct.* 497, 100 *L.Ed.* 511 (1956); *Brown, supra,* 161 *U.S.* 591, 16 *S.Ct.* 644, 40 *L.Ed.* 819; *see also Kastigar v. United States,* 406 *U.S.* 441, 451–52, 92 *S.Ct.* 1653, 1660–61, 32 *L.Ed.*2d 212, 220–21 (1972) (discussing *post-Counselman* statutory and decisional treatment of immunity).

Over the years lawmakers felt constrained by the breadth of transactional immunity. It was perceived as being overprotective of the interests covered by the privilege against self-incrimination. As a result, considerable efforts were directed toward finding a middle ground between "use" immunity and "transactional" immunity, between the least and most protective forms of immunity. *See id.* at 451–52, 92 *S.Ct.* at 1660–61, 32 *L.Ed.*2d at 220–21; 2 National Commission on Reform of Federal Criminal Laws, Working Papers 1406–09, 1422–32 (1970). This led to the development of "use and derivative use," or "use and fruits," immunity.

█▌ Under this form of immunity the state is barred from using compelled testimony or any evidence that was developed as a result of such testimony to prosecute a defendant who had given the compelled testimony, but it can use any evidence that is found or derived through means totally independent of the compelled testimony; and it may use such independently obtained evidence to prosecute a defendant even if the prosecution is for the same crime or criminal events that were the subject of the compelled testimony.

The Supreme Court in *Kastigar v. United States, supra,* upheld the constitutionality of use and derivative use immuni-

ty.[2] The reasoning underlying the Court's holding is that the fifth amendment does not require that one who invokes the privilege against self-incrimination may not be subsequently prosecuted for the same criminal acts or events that are the subject of compelled testimony. 406 *U.S.* at 453, 92 *S.Ct.* at 1661, 32 *L.Ed.*2d at 222. Observing that the only constitutional requirement that must be honored in this area is that "the immunity granted [be] ... coextensive with the scope of the privilege [against self-incrimination,]" *id.* at 448, 92 *S.Ct.* at 1658, 32 *L.Ed.*2d at 219, the Court reasoned that there could be circumstances under which a subsequent prosecution, even for the same acts or events, would not violate the privilege. Accordingly, a grant of immunity does not, under the fifth amendment, *per se* confer absolute immunity from prosecution even with respect to the same criminal transaction.

The key to understanding the scope of protection of the privilege under the Court's analysis is its perception that it is the impermissible *use* of compelled testimony that is the object of the privilege's protection. The privilege, in effect, mandates neutralizing the prosecutorial use of compelled testimony. The emphasis of the Supreme Court was that a subsequent prosecution may be constitutionally allowed as long as it "insures that the testimony cannot lead to the infliction of criminal penalties on the witness." 406 *U.S.* at 453, 92 *S.Ct.* at 1661, 32 *L.Ed.*2d at 222.

---

[2]Earlier in *Murphy v. Waterfront Commission,* 378 *U.S.* 52, 84 *S.Ct.* 1594, 12 *L.Ed.*2d 678 (1964), the Supreme Court had held that only use and derivative use immunity was required where the Federal Government prosecuted someone who had earlier been questioned by a state government's officials. The *Murphy* decision involved considerations of federalism not present in situations where a single state jurisdiction both questioned and prosecuted the same defendant; thus where federal concerns and standards were clearly implicated transactional immunity was still required. *United States v. McDaniel,* 449 *F.*2d 832, 838 (8th Cir.1971), *cert.* den. *McDaniel v. United States,* 405 *U.S.* 992, 92 *S.Ct.* 1264, 31 *L.Ed.*2d 460 (1972).

The Supreme Court did not amplify circumstances under which a subsequent prosecution involving earlier compelled testimony would constitute "the infliction of criminal penalties." It ruled simply that the State in bringing a subsequent prosecution must establish only that it had "an independent, legitimate source for the disputed evidence." *Id.* at 460, 92 *S.Ct.* at 1665, 32 *L.Ed.*2d at 226. In reinforcing the point that under a valid statute a witness is "not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities," *ibid.*, at 460, 92 *S.Ct.* at 1665, 32 *L.Ed.*2d at 226, the Court placed the burden of proof on the state. The Court emphasized the weight of this prosecutorial burden by declaring that it

is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony. [*Ibid.* at 460, 92 *S.Ct.* at 1665, 32 *L.Ed.*2d at 226.]

This decisional history strongly informs our own understanding of the scope of the privilege against self-incrimination under both federal constitutional standards and state law.

Prior to the *Kastigar* decision, our compelled immune testimony statute, *L.* 1968, *c.* 195, *N.J.S.A.* 2A:81–17.3 (amended 1973), prohibited the State from use of the actual "testimony or evidence" that a defendant had been required to give on prior occasions. Thus, on its face, the statute provided only direct "use" immunity, which had never received constitutional sanction. *See Counselman v. Hitchcock, supra,* 142 *U.S.* 547, 12 *S.Ct.* 195, 35 *L.Ed.* 1110. When originally enacted, the drafters of the statute used this form of immunity instead of the broader form found in the Model Witness Immunity Act on which the statute was ostensibly based. That model provided for transactional immunity, that is, immunity for "any transaction, matter or thing concerning which ... [the witness] gave answer or produced evidence." Nevertheless, reflecting the constitutional unease with direct-use immunity, some judicial opinions suggested by *dicta* that the narrower language of the

original compelled immune testimony statute, though couched in terms of direct-use immunity, could be read as affording immunity from both use *and* "fruits," *i.e.* use and derivative use. *See In re Zicarelli*, 55 *N.J.* 249, 269–70 (1970); *In re Addonizio*, 53 *N.J.* 107, 115 n. 1 (1968). However, although this Court in *In re Zicarelli, supra*, 55 *N.J.* at 265–71, upheld the "use and derivative use" immunity that was provided by a different statute, *N.J.S.A.* 52:9M–17(b), dealing with testimony compelled by the State Commission of Investigation, it was never definitively held that the statutory immunity of *N.J.S.A.* 2A:81–17.3 provided more than the direct-use immunity found to be constitutionally deficient under *Counselman.*

Significantly, the Court's opinion in *Zicarelli* was later affirmed by the Supreme Court in *Zicarelli v. Investigation Commission*, 406 *U.S.* 472, 92 *S.Ct.* 1670, 32 *L.Ed.*2d 234 (1972), the companion case to *Kastigar.* Accordingly, following the announcement of *Kastigar*, the Legislature concluded that there was a need to modify the immunity statute so that it would confer the broader immunity as formulated and approved in that decision. Therefore, it amended the statute to "make it clear" that full "use and derivative use" immunity was being provided. Senate Judiciary Committee, Statement to S.1154 (Jan. 22 1973); *see* Governor's Press Release, May 7, 1973 (describing amendment of the statute as replacing narrow "use" immunity with "use and derivative use" immunity). The amendatory provision providing for the use and derivative use immunity in *N.J.S.A.* 2A:18–17.3 was modelled after *N.J.S.A.* 52:9M–17(b), as approved by the Supreme Court in *Zicarelli. See* Sponsor's Statement to *L.* 1973, *c.* 112, § 1 (eff. May 7, 1973).

Thus, in addition to the prior bar against the later use of "testimony or evidence" that was the subject of compelled testimony, the State by virtue of the 1973 amendment was also prohibited from engaging in a subsequent prosecution involving the use of "any information directly or indirectly derived from such testimony or evidence …" *N.J.S.A.* 2A:81–17.3.

*Kastigar* has served to provide the broad guidelines for immunity situations. *See, e.g., State v. Vinegra,* 134 *N.J. Super.* 432, 440 (App.Div.1975); *State v. Gregorio,* 142 *N.J. Super.* 372 (Law Div. 1976). However, the general standard of *Kastigar* does not provide specific guidance for determining applications of use and derivative use immunity. We must therefore consider the factors that should govern a determination of whether evidence used in a subsequent prosecution is sufficiently untainted by earlier compelled testimony. These considerations are somewhat reminiscent of those that bear on whether after-acquired evidence is tainted as the result of being the fruit of an unconstitutional search or seizure. *See, e.g., State v. Sugar,* 100 *N.J.* 214 (1985). There are, nevertheless, signal differences between these two kinds of evidential taint, differences that relate to a distinction, important in this context, between the fifth amendment and the fourth amendment, between the privilege against self-incrimination and the right to be free from an unreasonable search or seizure.

In *United States v. Kurzer,* 534 *F.*2d 511 (2d Cir.1976), the court in addressing these important differences, explained

> that the principle function of the Fourth Amendment exclusionary rule is to deter unlawful police conduct, *Tehan v. United States ex rel. Shott,* 382 *U.S.* 406, 413, 86 *S.Ct.* 459, 463, 15 *L.Ed.*2d 453, 458 (1966), and it can be argued that it serves little deterrent purpose to exclude evidence which is only indirectly and by an attenuated chain of causation the product of improper police conduct. The Fifth Amendment, in contrast, is by its terms an exclusionary rule, and as implemented in the immunity statute it is a very broad one, prohibiting the use not only of evidence, but of "information", "directly or indirectly derived" from the immunized testimony. [*Id.* at 516.]

Thus, the *Kurzer* court held, a proper immunity statute

> requires not merely that evidence be excluded when such exclusion would deter wrongful police or prosecution conduct, but that the witness be left "in substantially the same position as if [he] had claimed the Fifth Amendment privilege." [*Id.* at 516 (*quoting Kastigar, supra,* 406 *U.S.* at 462, 92 *S.Ct.* at 1666, 32 *L.Ed.*2d at 227).]

█ In construing our immunity statute, we endorse the proposition that the fifth-amendment protection relates not only to the deterrence of improper conduct but to the improper *use*

of compelled testimony. In this respect it differs importantly from the kind of protection that is essential under the fourth amendment, which relates primarily to the improper and unreasonable *obtaining* of evidence. *See State v. Novembrino*, 105 *N.J.* 95 (1987); *State v. Sugar, supra.* It is the difference between the constitutional right in not being compelled to incriminate oneself and the right in not having one's privacy unreasonably invaded.[3] The fourth amendment's protection of privacy expectations addresses a wrong—the unreasonable invasion of privacy—that has already occurred before any attempted use of evidence; the essence of the fourth amendment protection is to redress and prevent the recurrence of that wrong. *Ibid.* While the protections against self-incrimination are naturally concerned with improper conduct, "the harm which the Fifth Amendment is designed to forestall is not accomplished when the witness is compelled to testify ... but when compelled testimony is used against the testifier in a criminal prosecution." *In re Grand Jury Proceedings*, 497 *F.Supp.* 979, 983–84 (E.D.Pa.1980).

In addition, the protection against self-incrimination at issue here is heightened because we are dealing with judicially compelled testimony. The stakes are thus greater than those involved when the primary abuse involves police misconduct,

---

[3]The Supreme Court has noted that this distinction between the right in not being compelled to incriminate oneself and the right in not having one's privacy unreasonably invaded is crystallized by the difference between testimonial evidence and non-testimonial evidence. Thus, in *United States v. Doe*, 465 *U.S.* 605, 104 *S.Ct.* 1237, 79 *L.Ed.*2d 552 (1984) and *Fisher v. United States*, 425 *U.S.* 391, 96 *S.Ct.* 1569, 48 *L.Ed.*2d 39 (1976), it held that the compelled production of documents will implicate the fifth amendment only if the compelled act of producing documents is "testimonial" in character. However, our Court has not eschewed the notion that privacy interests are also implicated in the privilege against self-incrimination; we thus recognized that even the compelled production of documents that is not "testimonial" in character can violate a privacy interest that is also protectable under the state privilege against self-incrimination. *See In the Matter of Grand Jury Proceedings of Guarino*, 104 *N.J.* 218 (1986) (relying on *United States v. Boyd*, 116 *U.S.* 616, 6 *S.Ct.* 524, 29 *L.Ed.* 746 (1886)).

which can be redressed by remedies that serve to deter future police misconduct. *See Delguidice v. New Jersey Racing Comm'n,* 100 *N.J.* 79 (1985). This consideration demands that the party compelled to testify must suffer no prosecutorial disadvantage, but must remain in substantially the same position as if he had made no statement, "as if [he] had claimed the Fifth Amendment privilege." *Kastigar, supra,* 406 *U.S.* at 462, 92 *S.Ct.* at 1666, 32 *L.Ed.*2d at 277. This, then, mandates the bar against prosecutorial use of all later testimony and evidence that would not have been developed or obtained but for the compelled testimony.

We conclude therefore that the fifth amendment mandates the strictest scrutiny of and the strongest protections against possible prosecutorial misuse of testimony with respect to a witness who had earlier been compelled to testify under the grant of immunity. We add that our state-law privilege against self-incrimination is, if anything, more protective than the fifth amendment. *State v. Hartley,* 103 *N.J.* 252, 186 (1986); *see State v. Deatore,* 70 *N.J.* 100, 112–14 (1976); *see also State v. Stever,* 107 *N.J.* 543, 556 (1987) ("right to be free from compelled self-incrimination.... [is] firmly established as part of our State common law"); *In the Matter of Grand Jury Proceedings of Guarino,* 104 *N.J.* 218 (1986) (state privilege against self-incrimination includes privacy interests that may be implicated in testimonial compulsion even though the fifth amendment does not address such privacy interests). We therefore conclude that this result, entailing both the strictest scrutiny of and the greatest protections against prosecutorial use of compelled testimony, is required under our state-law privilege against self-incrimination.

Accordingly, we hold that under the "use and derivative use" immunity as provided by *N.J.S.A.* 2A:81–17.3, when the State seeks to use evidence against a defendant relating to criminal acts or events that were the subject of earlier compelled testimony obtained from the defendant in exchange for

immunity, the State must prove that such evidence was developed or obtained from sources or by means entirely independent of and unrelated to the earlier compelled testimony. The bar is against the prosecutorial use of any and all evidence that would not have been developed or obtained but for the compelled testimony.

Consistent with the important interests to be served by these strict standards, we further hold that the burden of proof imposed on the State must be by "clear and convincing" evidence. No less a burden of proof will suffice to entitle the State to engage in a prosecution of a witness who has given earlier compelled testimony under a government grant of immunity.

## III.

In accordance with the constitutional and state-law standard we have adopted to govern the application of *N.J.S.A.* 2A:81–17.3, we must ascertain whether the State has proved by clear and convincing evidence that later incriminating evidence used to indict the defendant was obtained from a legitimate source independent of defendant's earlier compelled testimony. We are required, therefore, to examine the facts with particular care to determine if the State would not have obtained the evidence used to indict defendant "but for" defendant's earlier compelled testimony.

## A.

The record in this case reveals that on February 20, 1981, Maurice Forner was mugged in Camden. His watch and wallet were stolen. He was seriously injured and died four days later without ever regaining consciousness. There were no witnesses to the mugging, but the police received a report from some pedestrians that three black teenagers had been seen going through the victim's car a short distance from the body. The defendant in this case, Michael Strong, his two co-defendants,

Theodore Custis and Christopher Watson, and an acquaintance of theirs, Gregory Atkinson, were all subsequently arrested.

On the night of the arrest Atkinson gave a statement to the police and was released. He was never charged with the crime. Atkinson claimed that he had been standing nearby when a fellow named "Sweet" [*i.e.*, defendant Strong], walked over to him followed by "Ways" [*i.e.*, Custis], and then "Crist" [*i.e.* Watson], who was carrying beer and brandy. Atkinson also indicated that "Sweet" had made self-incriminating comments to him.

Strong, a juvenile, was charged with murder and robbery. Custis and Watson were also charged. A waiver hearing was scheduled for Strong on March 19, 1981. One or two days before the hearing, Assistant Prosecutor Arnold Golden offered Strong informal transactional immunity. This offer was rejected by Strong's counsel who feared another prosecutor might not later abide by the agreement. On the day of the scheduled waiver hearing, however, Golden withdrew charges against Strong without prejudice based on his conclusion "that we have insufficient evidence upon which to proceed at this time." Custis was subsequently waived to the Superior Court to be prosecuted as an adult criminal offender.

On March 25, Golden petitioned the Attorney General for formal immunity for Strong pursuant to *N.J.S.A.* 2A:81–17.3. According to the record, Golden made a note indicating the reasoning for the decision:

> [a]t the present time there is insufficient evidence upon which to indict Michael Strong, and we have no forseeable prospects of obtaining such evidence.... I have a strong suspicion that if Strong testified truthfully he would implicate himself and Watson and Custis in the crime.... Should we uncover additional evidence, not flowing from his own statement, which implicates Strong, we would still be in a position to prosecute him.

The prosecutor's request was granted by the Attorney General on April 7, giving immunity for the "use and derivative use" of Strong's compelled testimony.

On the same day, Strong was called to testify before the grand jury in the cases being presented against Custis and Watson. He implicated himself, Custis, and Watson, and described the planning and enactment of the mugging. According to Strong, the three had planned to "go make some money" by mugging someone. He testified that Custis was the only one who hit their victim, but that Watson took the man's watch and wallet. While leaving the scene after the initial mugging they realized there was only six dollars in Forner's wallet, at which point Strong suggested that they return to the victim lying on the ground to search his body for hidden money. Strong confirmed that Atkinson had nothing to do with the mugging. He testified that he had not spoken to anyone except his mother about the mugging. The only other person called before the grand jury in the Custis and Watson cases was one of the police officers involved with the case. Atkinson was not called to testify before the grand jury.

Both Custis and Watson were indicted for murder and robbery. The defense was provided with Strong's grand jury testimony on April 30. Custis pled guilty on June 22. Watson prepared to go to trial.

In May, after Watson had been given the transcript of Strong's April grand jury testimony, Strong discussed the crime with William Smith. In this discussion Strong incriminated himself. Describing his encounter with Strong, Smith later told the grand jury that

> Well, Ways and Chris [Custis and Watson] is like good friends. We're close, okay. We can't get no closer, and I came home and found out that they had been arrested for murder or whatnot. I heard. I called him, Sweet, Michael Strong.
>
> Q What's his nickname?
>
> A Sweet, or whatnot. I had found out that he was down, only he was in with it, too. They told me—well, the way I was picking it up off the street, that he turned the States on him, but he was involved in it. I was trying to find out all I could find out from him because Chris was asking me—Chris wasn't actually asking me, but his sister was telling me to find out all this here.
>
> Q For what reason?

A To help see if I could help Chris. Chris told me that Mike had turned the State's evidence, or whatnot. I was trying to find out as much as I could.

Thus, according to Smith, he engaged in conversations with Strong in order to assist Watson, who had knowledge of Strong's compelled testimony.

In August, Golden moved for discovery from Watson and received a letter listing thirty-eight defense witnesses. The list included the names of William Smith and Daniel Stokes. Golden then directed an investigator to interview Smith and Stokes. He summarized the facts of the case to the detective and gave him a list of questions, including two that specifically concerned Michael Strong and his participation in the murder. Smith told the investigator that in May Strong had made admissions to him about the mugging. Stokes was also interviewed, but told the investigator that Strong and he had not discussed the case.

Discovery from Watson also listed Atkinson as a fact witness for the Watson defense. Golden interviewed Atkinson prior to Watson's trial. This was the first contact between the prosecution and Atkinson since the night of the arrest. Golden reviewed with Atkinson his initial arrest statement in which he had implicated Strong.[4] Also, according to a memo made after Watson's trial, Golden noted: "I interviewed Gregory Atkinson and learned that Strong had also made admissions to Atkinson."

Watson was tried in October 1981; Golden was the prosecuting attorney. Strong testified under a second grant of immunity. Atkinson was also called by the State and testified at the trial. He was questioned only about Watson's possession of the victim's watch found in Watson's glove. He made no other statement concerning Strong.

---

[4]Atkinson also specifically stated that Strong had possessed the victim's wallet, which he discarded when he was put into the police car on the night of the arrest. According to a police report and police testimony at a prior hearing, however, Custis possessed the wallet. At Strong's later waiver hearing the police testified that whoever was first placed in the police car had held the wallet.

On October 30, Golden presented Atkinson to a grand jury. Being unable to locate William Smith, Golden closed the file on Strong after Atkinson testified. On July 1, 1982, Smith, who had been located, was presented to the grand jury. Smith told the grand jury that Strong told him that he, Custis, and Watson attacked Forner to get money. Smith said that Strong also told him that he had picked up the victim's wallet from the ground, but that he did not tell Smith what he did with it after that. In addition to relating that Strong had made admissions concerning the mugging, Smith was questioned about whether Strong had also made admissions to anyone else. Smith indicated that Strong had probably done so to his sister Donzella Strong and to Daniel Stokes, contradicting Stokes' earlier denials to the police investigating the Watson case. Smith described Stokes and called him Strong's "partner" or best friend.

Donzella Strong and Daniel Stokes were brought before the grand jury two weeks later. Donzella testified that Strong had told her about the mugging immediately after he had been released from custody. Stokes said that he was at Strong's house when Strong was arrested. According to Stokes, when Strong was released from custody he asked him what happened. Initially Strong refused to tell him, but apparently Strong did tell Stokes that he (Strong) had acted as a lookout during the mugging and that they had planned to go out "to get paid" the night of the mugging. Stokes knew no further details.

Strong was charged with murder and robbery on August 5. On November 4 Strong pled guilty to felony murder expressly reserving his right to appeal on the *Kastigar* issue. He was sentenced to an eighteen-year term.

## B.

It is clear that the two linchpins of the evidentiary case against Strong are the testimony of Smith and Atkinson. Smith's information includes Strong's confession to him; it also

includes the leads to two other witnesses, Donzella Strong and Michael Stokes, who testified to additional confessions of Strong. Atkinson's testimony provides independent support for the other testimony, as well as an eyewitness account of Strong's actions at the time of his arrest. In terms of whether there was a violation of the immunity granted to Stone for his compelled testimony, these circumstances present these specific questions: (1) whether Smith's testimony would not have been obtained but for Strong's earlier compelled testimony; (2) whether Smith's testimony constituted an "investigatory lead" that resulted in the testimony of Donzella Strong and Michael Stokes; and (3) whether the decision to focus on Atkinson's statement at the time of his arrest, and to use Atkinson as a grand jury witness, would not have occurred but for the testimony by Strong.

■ The trial court found[5] that the State was led through discovery in the Watson prosecution to William Smith, who gave a statement to an investigator that Strong admitted participating in the crime, and later Smith so testified before the grand jury. It also found that Smith led the police to Donzella Strong, defendant's sister, who, like Smith, testified before the grand jury to Strong's admissions. From Smith, the court noted, the police learned the identity of Daniel Stokes, who also testified that defendant admitted that he had acted as a lookout during the robbery.

We are satisfied from our meticulous review of the evidence that Smith's identity as a potential witness did not result directly or indirectly from Strong's earlier compelled testimony. Smith's identity became known to the prosecutor only through

---

[5]With one exception, both parties agree with the trial court's findings of fact. The exception is that the defense objects to a finding that "one of the arresting officers stated in his report that the first person in the patrol car was the one who discarded the [victim's] wallet and that person was Custis." The defense is correct that no such reference is in the police reports or in police testimony given before Strong's grand jury testimony. *Supra* at 599 n. 4.

discovery of Watson. The record is barren of any suggestion that the inclusion of Smith's name as a witness for Watson and the State's subsequent contacts with Smith occurred because Strong had been compelled to testify by the State under a grant of immunity.

Whether the content of Smith's testimony itself indirectly resulted from, and therefore was not derived independently of, Strong's earlier compelled testimony is a close question. Stated differently, the question is whether but for Strong's earlier compelled testimony the State would not have been able to obtain Smith's testimony.

It is clear that Smith's motivation in obtaining information from Strong was because Smith wanted to help Watson, who was his friend. However, it is not clear to what extent the fact that Strong had given compelled testimony under a grant of immunity was a factor that apparently influenced Smith's actions or his subsequent conversations with Strong. His reasons for talking to Strong were that he, Smith, knew that Strong had testified against Watson before the grand jury and he wanted to find out whether he could help Watson in some way. The critical question is whether Smith's motivation in seeking and eventually acquiring information from Strong was the fact that Strong had given compelled testimony that might be damaging to himself as well as to his friend, Watson.

A witness who is motivated to testify against a defendant because of the defendant's compelled testimony may in some cases fall within the bar against later use of compelled testimony. The importance of witness motivation is reflected in *Kurzer, supra,* 534 *F.*2d 511. There the court accepted the government's argument that if it could show that a witness's statement was motivated solely by the fact that the government was developing a substantial case in areas unrelated to immunized testimony, and this would have occurred even if that testimony had not been given, then this would satisfy the *Kastigar* requirement that the later statement's derivation was

"wholly independent" of the immunized testimony. *Id.* at 517. Conversely, if the State could not establish that the compelled testimony was irrelevant to the witness' decision to provide additional testimony, the use of that testimony would be barred. Accordingly, the court remanded the case for the trial court to determine the credibility of the later witness with regard to both his honesty and his ability to isolate the factors that convinced him to cooperate with the State against the defendant. *Id.* at 517–18. Similarly, witness motivation played a role in *United States v. Rinaldi,* 808 *F.*2d 1579, 1584 n. 7 (D.C.Cir. 1987), where it was held that courts must consider, among other things, whether a witness's "anticipated testimony was motivated by, and therefore indirectly derived from, ... [the defendant's prior] immunized statements to the police, and what effect, if any, that may have had on its admissibility." *See also United States v. Brimberry,* 744 *F.*2d 580, 587 (7th Cir.1984) ("the government must prove that ... [the witnesses] would have testified against the defendant because of the case the government had developed against them entirely apart from the defendant's information."), following remand, *United States v. Brimberry,* 803 *F.*2d 908, 917 (7th Cir.1986), *cert. den. sub nom. Brimberry v. United States,* —— *U.S.* ——, 107 *S.Ct.* 1977, 95 *L.Ed.*2d 817 (1987).

We realize that the situation presented here is somewhat different from the facts in *Kurzer, Rinaldi,* and *Brimberry* in that the State itself did not, at least initially, use Strong's immunized testimony to obtain Smith as a witness, and that, further, the substantive evidence at issue here is an admission by the defendant made after he was compelled to testify. However, we are impelled by the same consideration that led the courts in those cases to exclude testimony that is motivated by compelled testimony as opposed to testimony actuated by extraneous factors. Factors influencing a witness to come forward, such as his wholly fortuitous knowledge of the defendant's compelled testimony or his awareness that an anticipated prosecution against the defendant is not based at all on the

defendant's compelled testimony, do not engender the same protective concern over the improper use of compelled testimony. That concern is the desire to put the defendant in substantially the same position he would have been in if he had not been compelled to testify. *See Kastigar, supra,* 406 *U.S.* at 462, 92 *S.Ct.* at 1666, 32 *L.Ed.*2d at 227. This concern is triggered when the disclosure of a defendant's compelled testimony itself prompts and motivates a private citizen to elicit an admission from the defendant or to gather evidence against him. Therefore, unless the State can show by clear and convincing evidence that Smith would have been motivated to inquire into Strong's role in the crime even if Strong had not been compelled to give testimony damaging to himself and Watson, Smith's testimony regarding Strong's admission cannot be used in a subsequent prosecution of Strong.

Here, it is not clear whether the trial court fully explored the subtle but significant issue of witness motivation. The trial court must recognize that the burden of proof to establish the absence of taint is on the State. Under the facts, it must consider as against the standard of clear and convincing evidence whether Smith was motivated to obtain evidence and provide testimony because Strong had already given compelled testimony that incriminated himself as well as Watson. It is not apparent under this burden of proof whether Smith would have elicited an incriminating confession from Strong, and then testify to this confession, if Strong had not given compelled testimony. The status of Smith's testimony in terms of Smith's motives in seeking this information is crucial to a determination of whether that testimony is wholly independent from the defendant's compelled testimony. Because this issue was not fully explored and developed, there must be a remand and reconsideration of this issue.

As mentioned, Smith's testimony itself became the basis of an investigatory lead that resulted in the State's acquisition of the testimony of Donzella Strong and Daniel Stokes. *Kastigar, supra,* 406 *U.S.* 441, 92 *S.Ct.* 1653, 32 *L.Ed.*2d 212, held that the limited immunity would preclude in a subsequent

prosecution not only the direct use of compelled evidence or its fruits but would also bar "the use of compelled testimony as an 'investigatory lead,' [as well as] ... barring the use of any evidence obtained by focusing an investigation on a witness as a result of his compelled disclosures." *Id.* at 460, 92 *S.Ct.* at 1664, 32 *L.Ed.*2d at 226; *see also Rinaldi, supra,* 808 *F.*2d 1579 (relevant for court to determine whether a different witness who also testified against the defendant was located only due to information in the immunized statement and would otherwise not have been found). Thus, if on remand the trial court concludes that Smith's testimony must be barred, then so must Stokes' and Donzella Strong's testimony. Their testimony without question was developed through information provided by Smith. The chain of causation is clear: but for Smith's compelled testimony the State would not have been led to either Stokes or Donzella Strong.

The circumstances surrounding the acquisition of Smith's testimony and its causal relation, if any, to Strong's compelled testimony must be viewed in still another light. The prosecutor, as mentioned, was led to Smith through conventional pretrial discovery in Watson's prosecution. The trial court was strongly influenced in its determination that there was no taint attributable to Strong's compelled testimony by the fact that this occurrence, the identification of Smith as a defense fact witness, was unrelated to and independent of Strong's compelled testimony. That circumstance, the independent discovery of Smith's identification, without anything else occurring, might otherwise suffice to sanitize Smith's later testimony in relation to Strong's earlier compelled testimony. However, the court did not carefully consider that, following the identification of Smith as a witness, the investigator who interviewed Smith was prepared by the prosecutor who was familiar with Strong's earlier compelled testimony. Thus, the investigator asked particular questions of Smith that might have been formulated and based on Strong's earlier testimony. Further, as noted, as a result of this interview, the State not only

obtained Smith's testimony but was led by Smith to Donzella Strong and Daniel Stokes. In addition, the trial court found that Atkinson, originally a suspect, but later determined to have been free of any involvement in the murder, gave a statement implicating Strong in the crime. Atkinson's credibility as a witness was seemingly enhanced with the acquisition of the testimony of the others, Smith, Donzella Strong, and Stokes, incriminating Strong, and thus became still another by-product of Strong's own compelled testimony.

 This congeries of additional facts and circumstances raises another relevant issue bearing on the causal relation between Smith's testimony and the defendant's compelled testimony. It appears that the prosecutor's actual use of Strong's compelled testimony was a factor that may have guided the investigation and influenced the preparation of the State's case against Strong. A majority of jurisdictions agree that if a prosecutor actually uses immunized testimony as the basis for his trial strategy, then the result of this must be voided. Prosecutorial use may take a variety of forms. In *United States v. McDaniel*, 482 *F.*2d 305 (8th Cir.1973), the court observed that such use

> could conceivably include assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy. [*Id.* at 311.]

Indeed, some cases have recognized that where there is prosecutorial access to or familiarity with compelled testimony, such prosecutorial use for purposes of a later prosecution will be inferred, and that a heavy burden of proof is placed on the state to negate this inference of prosecutorial use. *See, e.g., United States v. Semkiw*, 712 *F.*2d 891 (3d Cir.1983); *United States v. Dornau*, 359 *F.Supp.* 684 (S.D.N.Y.1973). In addition, a similar heavy burden is placed on the state to show that its pre-trial investigation of a crime was insulated from use of any compelled materials. *See, e.g., United States v. Smith*, 580 *F.Supp.* 1418, 1424 (D.N.J.1984); *United States v. Hossbach*,

518 *F.Supp.* 759, 772–73 (E.D.Pa.1980); *see also United States v. Hampton*, 775 *F*.2d 1479 (11th Cir.1985) (evidence could be suppressed as indirectly derived from immunized testimony where investigators had used records based on the testimony in preparing reports read by prosecutors, who did not themselves read the immunized statement); *cf. U.S. v. Caporale*, 806 *F*.2d 1487, 1518 (11th Cir.1986) (under *Kastigar*, "[t]he focus of the inquiry ... is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant.").[6]

In this case, the record suggests that the prosecutor not only was directly exposed to Strong's immunized testimony but may have made actual use of it in preparing the case against Strong. Nevertheless, it does not appear that these facts were considered fully by the trial court within the framework that we have now provided. It is therefore appropriate that these factual issues relating to prosecutorial use of the compelled testimony in investigating and preparing the case against Strong also be reconsidered in the remand.

## IV.

In conclusion, the strict "but for" test is mandated by the immunity statute's bar against use of any evidence "directly *or indirectly* derived ..." from compelled testimony. *N.J.S.A.* 2A:18–17.3 (emphasis added). This in turn reflects the requirements found in the fifth amendment and state law protections against self-incrimination. This concern is indeed accentuated when the State seeks to use of evidence from *compelled* testimony; the concern reaches beyond the kind of police mis-

---

[6]We do not in this case address the specific question whether a prosecutor who has become familiar with compelled testimony must thereafter be insulated from a later participation in the prosecution of the witness. It may be observed, however, that the subtle and difficult fact issues in this case involving actual prosecutorial use of such compelled testimony could be eliminated or substantially reduced if such prosecutors were to remove themselves from the case.

conduct that may be responsible for actual or presumed involuntary testimony because here the "immunity ... is granted under prosecutorial and judicial supervision." *Kurzer, supra,* 543 *F.*2d at 516 n. 8. Though we acknowledge the usefulness of compelled immunized testimony, such testimony cannot in any substantial sense lead to the penal detriment or punishment of its maker. To hold otherwise would be inconsistent with the fifth amendment. Independent of this federal constitutional mandate, it would also be violative of our State's traditional protections against self-incrimination, *State v. Hartley, supra,* 103 *N.J.* 252; *State v. Fary,* 19 *N.J.* 431 (1955), and inconsistent with our notions of what constitutes fundamental fairness in the prosecution of criminal matters. *See State v. Abbati,* 99 *N.J.* 418 (1985); *State v. Tropea,* 78 *N.J.* 309 (1978).

Consistent with these substantive principles, the State has the affirmative burden to demonstrate by clear and convincing evidence that it did not, in this case, make indirect use against Strong of his earlier compelled testimony through additional incriminatory evidence against him that was developed and used as a basis for his indictment. Only such a showing can satisfy us that the indictment of Strong would not violate the terms of Strong's limited use and derivative use immunity and his privilege against self-incrimination under the fifth amendment and state law.

Accordingly, we stay execution of the judgment of conviction; we reverse the order denying the dismissal of the indictment, and remand the matter for a new hearing on defendant's motion to dismiss the indictment.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN–7.

*For affirmance*—None.