627 A.2d 1112

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. MILTON OCTAVIUS PATTON, DEFENDANT–RESPONDENT.

Argued February 16, 1993—Decided August 3, 1993.

390

Barbara A. Rosenkrans, Assistant Prosecutor, argued the cause for appellant (James F. Mulvihill, Acting Essex County Prosecutor, attorney).

Lawrence E. Miller argued the cause for respondent (LeBoeuf, Lamb, Leiby & MacRae, attorneys; William R. Holzapfel, Daniel J. McCarthy, Ellen B. Silverman, Elizabeth J. Gorman, and Francis V. Cook, on the briefs).

*Richard W. Berg,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney).

The opinion of the Court was delivered by

STEIN, J.

In this appeal we consider the constitutionality of *N.J.S.A.* 2C:35–10c, which provides:

Any person who knowingly obtains or possesses a controlled dangerous substance or controlled substance analog in violation of subsection a. of this section and who fails to voluntarily deliver the substance to the nearest law enforcement officer is guilty of a disorderly persons offense. Nothing in this subsection shall be construed to preclude a prosecution or conviction for any other offense defined in this title or any other statute.

The Law Division concluded that *N.J.S.A.* 2C:35–10c violated defendant's privilege against self-incrimination because it requires defendant to surrender to police tangible evidence establishing his possession of a controlled dangerous substance in violation of *N.J.S.A.* 2C:35–10a. However, that court preserved the statute's constitutionality by construing it to confer use and derivative-use immunity on any person who complies with its mandate. The Law Division concluded that its interpretation was not inconsistent with the Legislature's intent in enacting the statute.

Although the Appellate Division agreed that the statute conflicted with defendant's privilege against self-incrimination, 256 *N.J.Super.* 413, 417–18, 607 *A.*2d 191 (1992), it disagreed that a grant of use and derivative-use immunity was consistent with the legislative intent, *id.* at 420–21, 607 *A.*2d 191. The Appellate Division concluded that the last sentence of subsection c—"Nothing in this subsection shall be construed to preclude a prosecution or conviction for any other offense defined in this title or any other statute"—precluded a grant of immunity. *Id.* at 421–22, 607 *A.*2d 191. The court reversed defendant's conviction, holding that his proper assertion of the privilege against self-incrimination was a complete defense to a prosecution under *N.J.S.A.* 2C:35–10c. *Id.* at 422–23, 607 *A.*2d 191.

We agree that the statute conflicts with defendant's privilege against self-incrimination. Nevertheless, we construe *N.J.S.A.* 2C:35–10c to confer use and derivative-use immunity on any person who complies with that subsection. That construction

preserves the validity of the statute by removing the threat of prosecution that might otherwise result from compliance with its provisions.

## I.

Defendant was arrested by inspectors of the Alcoholic Beverage Control Enforcement Bureau during a raid on a bar. Inspector Siri saw defendant remove something from his pants pocket and drop it to the floor. Inspector Siri retrieved a folded five-dollar bill containing .86 grams of cocaine. He then arrested defendant.

Defendant was indicted for third-degree possession of cocaine in violation of *N.J.S.A.* 2C:35–10a(1). Before trial, the State amended the charge to the disorderly-persons offense defined in *N.J.S.A.* 2C:35–10c. Defendant was tried by a Law Division judge sitting as a Municipal Court judge. *See N.J.S.A.* 2A:8–11, *repealed by L.* 1991, *c.* 91 (current version at *N.J.S.A.* 2B:2–2). Defendant was convicted of failing to deliver a controlled dangerous substance to a law-enforcement officer in violation of *N.J.S.A.* 2C:35–10c. The court sentenced defendant to a one-year suspended term. *N.J.S.A.* 2C:43–2b. The court also imposed a $500 Drug Enforcement and Demand Reduction penalty, a $50 forensic laboratory fee, a $30 Violent Crimes Compensation Board penalty, and a six-month revocation of defendant's driver's license.

The trial court thereafter granted defendant's motion in arrest of judgment, *R.* 3:21–9, finding that *N.J.S.A.* 2C:35–10c impermissibly compromised defendant's privilege against self-incrimination. The State appealed from that judgment. Construing the statute to confer use and derivative-use immunity on a person who complied with it, the Law Division reinstated defendant's conviction. On appeal from that determination, the Appellate Division held that to confer immunity would be improper. 256 *N.J.Super.* at 422, 607 *A.*2d 191. The court could not "confidently conclude that the Legislature would have wanted to provide this disorderly person 'downgrade option' if it had the potential of forestalling or impairing prosecutions for more serious offenses." *Id.* at 421, 607 *A.*2d 191. According to the Appellate Division, without that immunity, an assertion of the privilege against self-incrimination is

a full defense to the prosecution. *Id.* at 422, 607 *A.*2d 191. The Appellate Division held that defendant properly had asserted his privilege and it reinstated the judgment of acquittal. *Id.* at 423, 607 *A.*2d 191. We granted the State's petition for certification, 130 *N.J.* 395, 614 *A.*2d 617 (1992).

Defendant contends before us that his assertion of his privilege against self-incrimination bars his conviction under *N.J.S.A.* 2C:35–10c. According to defendant, that statute compels disclosure of evidence to the State that inevitably would lead to prosecution for other and substantially more serious offenses, and the statute therefore is unconstitutional. Defendant argues that the Legislature did not contemplate use and derivative-use immunity. Thus, according to defendant, invalidating the statute would be more consistent with the legislative intent than construing the statute to include that immunity.

The State argues that the statute does not violate defendant's right against self-incrimination. However, as a secondary argument, it urges us to read *N.J.S.A.* 2C:35–10c to provide use and derivative-use immunity to any person who complies with it by providing to the police evidence that may be incriminating. According to the State, that reading preserves defendant's privilege against self-incrimination and saves the statute from constitutional infirmity.

## II.

To put the issue in perspective, we first must consider the context in which *N.J.S.A.* 2C:35–10 was amended to include subsection c. In 1987, the Legislature enacted the Comprehensive Drug Reform Act of 1986, *N.J.S.A.* 2C:35–1 to –23 ("CDRA"). CDRA imposes severe mandatory sanctions on all drug offenders. "It reflects the Legislature's 'zero tolerance' for drug use and distribution and the State's commitment to use the coercive power of the criminal law to enforce this policy." *Final Report, Task Force on Drugs and the Courts* 5 (Apr. 1991). The enactment of CDRA caused a dramatic increase in the number of drug arrests. Report of the Special Committee to Assess Criminal Division Needs, 4 (Jan. 31, 1990). That increase exacerbated the pressure

on the criminal courts. As noted by the Supreme Court Task Force on Speedy Trial,

[e]xpansion of backlog translates into increased delay in resolving criminal cases. Since it is widely believed that the criminal justice system can be most effective in deterring crime by providing swift and certain punishment, delay in the criminal courts can be seen not only as undesirable in itself but a significant factor in increasing the risk of injury to citizens by criminal activity.

[The New Jersey Supreme Court 1986 Judicial Conference on Speedy Trial, *Report of the Committee on Delay Points and Problems Affecting Speedy Trial* 50 (May 1986) (*Speedy Trial Report*).]

In its 1986 report, issued prior to the enactment of CDRA, the Supreme Court Task Force on Speedy Trial acknowledged that the caseload of the criminal-justice system could be reduced significantly by prosecutors exercising their discretion to refer matters to municipal court for prosecution as disorderly-persons offenses. *Ibid.* It emphasized the importance of prosecutorial "screening" and noted that "the prosecutor should attempt to proportion the number of defendants being indicted to the capacity of the criminal courts to process the defendants." *Ibid.* To encourage that practice, the Task Force recommended that the Legislature "consider the enactment of statutes creating appropriate disorderly persons offenses for possession of small quantities of certain drugs * · * * to permit the use of prosecutorial discretion in the charging and screening process." *Id.* at 53.

In 1988, the Legislature amended *N.J.S.A.* 2C:35–10 by adding subsection c. *L.* 1988, *c.* 44. Since its enactment, *N.J.S.A.* 2C:35–10c has been used only as a mechanism to downgrade simple possession, an indictable offense, to a disorderly-persons offense. At oral argument, the Deputy Attorney General informed us that no defendants have been charged with a violation of that subsection except for those defendants whose charges had been downgraded from an original charge of simple possession. Between January 1, 1990, and November 5, 1992, indictable controlled dangerous-substance charges contained in a single indictment against 7,168 defendants have been downgraded to disorderly-persons offenses pursuant to *N.J.S.A.* 2C:35–10c.

Essex County has developed a comprehensive system for the processing and downgrading of simple-possession charges. The Law Division explained that system during oral argument before that court:

[T]he Attorney General, Prosecutor, and the Court System agreed that, with respect to pre-indictment cases, the Prosecutor would review all of these cases, make an inventory, determine what should be downgraded, and, then, a substantial number of those cases would be downgraded, and placed in a remand court, either before Judge Bloom, or back to another remand court which is being established in Newark, and some of those matters might be remanded directly back to the Municipal Court, and the third track, of course, would be to continue the cases, pre-indictment, on their way to the Grand Jury.

With respect to post-indictment cases * * * each Assistant Prosecutor was requested to review the cases that this particular Assistant Prosecutor had before the Judge to whom the Prosecutor was assigned, and, every Monday, produce approximately five cases which will be suitable for downgrading and remanding, until the Prosecutor had determined that there were no more cases that were suitable for downgrading and remanding.

Those downgraded, remanded cases would, preliminary at least, be handled by the same judge to whom they were assigned, and not be sent to any remand court. That has been done with respect to—it's a very substantial number of cases, and I think, at the present time, the Prosecutor, and Presiding Judge of Criminal, and Attorney General's Office are considering whether some of those post-indictment cases should go back to the remand court * * * but it's my understanding that has not happened as of yet.

Between January 1, 1992, and May 30, 1992, the Newark Pre–Complaint Screening Unit amended controlled dangerous-substance charges against 1,097 suspects to disorderly-persons offenses charging violations of *N.J.S.A.* 2C:35–10c. In addition, simple-possession charges against 605 suspects in all other Essex County municipalities were downgraded to the same disorderly-persons offense. Defendant's indictment was processed in accordance with that procedure.

### III.

We first must consider whether the criminalization of a person's failure to turn over to the police potentially incriminating evidence violates the federal constitutional right and state common-law privilege against self-incrimination. The Fifth Amendment to the United States Constitution protects persons against governmental compulsion to disclose information that would tend to incriminate

them. *In re Martin*, 90 *N.J.* 295, 331, 447 *A.*2d 1290 (1982). That protection was extended to the states through the Due Process Clause of the Fourteenth Amendment in *Malloy v. Hogan* 378 *U.S.* 1, 84 *S.Ct.* 1489, 12 *L.Ed.*2d 653 (1964). Although our state constitution does not have a similar provision, the privilege itself "is firmly established as part of the common law of New Jersey and has been incorporated into our Rules of Evidence." *Martin, supra,* 90 *N.J.* at 331, 447 A.2d 1290; *see Evid.R.* 24, 25. In some instances we have held that the state common-law privilege affords greater protection to an individual than that accorded under the federal privilege. *See, e.g., State v. Reed,* 133 *N.J.* 237, 269, 627 *A.*2d 630, 647 (1993); *In re Guarino,* 104 *N.J.* 218, 229–32, 516 *A.*2d 1063 (1986). However, as they relate to the issue before us, the state and federal privileges are coextensive.

█ The privilege against self-incrimination does not shield only against compelled testimony. It also applies to actions compelled by law if the act itself provides evidence that threatens to implicate the actor in a violation of law. *United States v. Doe,* 465 *U.S.* 605, 612–13, 104 *S.Ct.* 1237, 1242, 79 *L.Ed.*2d 552, 560 (1984). The privilege is implicated when the information sought to be extracted or the action compelled by statute presents a realistic threat of incrimination. In *Albertson v. Subversive Activities Control Board,* 382 *U.S.* 70, 86 *S.Ct.* 194, 15 *L.Ed.*2d 165 (1965), the United States Supreme Court set forth a three-prong test to determine whether a statute requiring a specific act violates the privilege against self-incrimination. That test requires courts to consider the following questions in discerning whether a statute compels action or information in violation of the privilege:

First, is the reporting requirement directed at a highly selective group inherently suspect of criminal activities, rather than the public at large? Second, does the inquiry concern an essentially non-criminal and regulatory area or does the inquiry take place in an area permeated with criminal statutes where response to any of the questions in context might involve the claimants of the privilege in the admission of a crucial element of the crime? Finally, would compliance with the disclosure requirement create a substantial likelihood of prosecution?

[*State v. Pontelandolfo,* 227 *N.J.Super.* 419, 426, 547 *A.*2d 738 (Law Div.1988) (citing *Albertson, supra* 382 *U.S.* at 77–79, 86 *S.Ct.* at 197–99, 15 *L.Ed.*2d at 171–72).]

In *Marchetti v. United States*, 390 *U.S.* 39, 41–42, 88 *S.Ct.* 697, 699, 19 *L.Ed.*2d 889, 894 (1968), the Supreme Court held that a proper assertion of the privilege against self-incrimination was a complete defense to criminal charges stemming from a defendant's failure to register and pay an occupational tax for engaging in the business of accepting wagers. The Court found that "wagering is 'an area permeated with criminal statutes,' and those engaged in wagering are a group 'inherently suspect of criminal activities.' " *Id.* at 47, 88 *S.Ct.* at 702, 19 *L.Ed.*2d at 897 (quoting *Albertson, supra,* 382 *U.S.* at 79, 86 *S.Ct.* at 199, 15 *L.Ed.*2d at 172). The *Marchetti* Court also found that "[e]very aspect of petitioner's wagering activities * * * subjected him to possible state or federal prosecution." *Ibid.* Thus, the *Marchetti* Court, relying on *Albertson,* invalidated Marchetti's conviction on the basis of his assertion of the privilege. *Accord Grosso v. United States,* 390 *U.S.* 62, 71–72, 88 *S.Ct.* 709, 715, 19 *L.Ed.*2d 906, 914 (1968); *see also Leary v. United States,* 395 *U.S.* 6, 12–29, 89 *S.Ct.* 1532, 1535, 23 *L.Ed.*2d 57, 68–78 (1969) (applying *Albertson* test and holding proper assertion of privilege complete defense to conviction for failure to pay transfer tax required by Marijuana Tax Act, 26 *U.S.C.A.* § 4744, *repealed by Pub.L.* 91–513, Title III, § 1101(b)(3)(A), 84 *Stat.* 1292 (1970)); *Haynes v. United States,* 390 *U.S.* 85, 95–100, 88 *S.Ct.* 722, 729–732, 19 *L.Ed.*2d 923, 931–34 (1968) (applying *Albertson* test and holding that proper assertion of privilege would bar conviction for failing to register firearm in violation of 26 *U.S.C.A.* § 5841, or possession of unregistered firearm in violation of 26 *U.S.C.A.* § 5851).

■ Thus, the threshold question before us is whether, under the *Albertson* test, the conduct compelled by *N.J.S.A.* 2C:35–10c violates the privilege against self-incrimination. *N.J.S.A.* 2C:35–10a defines the offense of simple possession. A person who knowingly possesses a controlled dangerous substance is guilty of a crime under that statute. The degree of the crime varies with the type and amount of the substance. A possessor who does not voluntarily deliver a controlled dangerous substance to the nearest law-enforcement officer is guilty of the disorderly-persons offense

defined in *N.J.S.A.* 2C:35–10c. However, compliance with that section necessarily is incriminating. A possessor will be providing law-enforcement authorities with tangible evidence that he or she is guilty of possession and perhaps of more serious offenses.

On its face, the statute applies only to those who obtain or possess controlled dangerous substances in violation of *N.J.S.A.* 2C:35–10a. Therefore, it is directed to a highly-selective group inherently suspect of criminal activity. Second, the statute operates in an area "permeated with criminal statutes." *Albertson, supra,* 382 *U.S.* at 79, 86 *S.Ct.* at 199, 15 *L.Ed.*2d at 172. Finally, the conclusion is inescapable that the surrender of controlled dangerous substances to law-enforcement officers creates a substantial likelihood of prosecution. Thus, under *Albertson,* the language of the statute conflicts with the federal and state privilege against self-incrimination.

## IV.

We must consider whether *N.J.S.A.* 2C:35–10c is susceptible to a construction that preserves the intention of the Legislature and does not compromise the privilege against self-incrimination. In *Right to Choose v. Byrne,* 91 *N.J.* 287, 311, 450 *A.*2d 925 (1982), we explained the hesitancy of courts to invalidate statutes on constitutional grounds. In that case, we outlined the factors that govern a constitutional inquiry:

> Appraisal of a constitutional defect begins with the assumption that the Legislature intended to act in a constitutional manner. With that assumption in mind, we must determine whether the Legislature would want the statute to survive with appropriate modifications rather than succumb to constitutional infirmities. Stated otherwise, we must ascertain whether the Legislature would have declined to adopt the statute or would have adopted it with the constitutional interpretation. That decision depends on the purpose, subject, and effect of the statute. It is our duty to save a statute if it is reasonably susceptible to a constitutional interpretation.
>
> [*Id.* at 311, 450 *A.*2d 925 (citations omitted).]

In those cases in which a statute was capable of a constitutional construction consistent with the intention of the Legislature, we have accorded it that construction. *See, e.g., State v. Lagares,* 127 *N.J.* 20, 32, 601 *A.*2d 698 (1992) (upholding constitutionality of

*N.J.S.A.* 2C:43–6f by requiring adoption of guidelines to assist prosecutorial decision-making); *State v. Zito,* 54 *N.J.* 206, 218, 254 *A.*2d 769 (1969) (interpreting statute proscribing failure to give good account of one's self as requiring police to provide opportunity to explain seemingly inculpatory circumstances).

The critical issue is whether construing the statute to confer use and derivative-use immunity is consistent with the legislative purpose. In *State v. Strong,* 110 *N.J.* 583, 588–93, 542 *A.*2d 866 (1988), we explored the decisional history of the United States Supreme Court in respect of the Fifth Amendment and recognized that that history informs our own understanding of the scope of the privilege. We explained that

> [t]he key to understanding the scope of protection of the privilege under the Court's analysis is its perception that it is the impermissible *use* of compelled testimony that is the object of the privilege's protection. The privilege, in effect, mandates neutralizing the prosecutorial use of compelled testimony.
>
> [*Id.* at 590, 542 *A.*2d 866.]

A grant of immunity frequently has been the mechanism used to neutralize the prosecutorial use of compelled testimony or a compelled testimonial act. As we explained in *Strong, supra,* the least restrictive and earliest form of immunity conferred was "use" immunity. That type of immunity merely protected a defendant against the use of compelled testimony or evidence in a subsequent prosecution. In 1892, the Supreme Court held that use immunity was not sufficiently protective of the Fifth Amendment privilege. *Counselman v. Hitchcock,* 142 *U.S.* 547, 12 *S.Ct.* 195, 35 *L.Ed.* 1110 (1892). In that case, the Court held that testimony may be compelled only if the witness is afforded absolute immunity from future prosecution for the offense to which the testimony relates. *Id.* at 587, 12 *S.Ct.* at 211, 35 *L.Ed.* at 1122. Referred to as "transactional" immunity, it " 'operate[s] as a complete pardon for the offense to which [the compelled testimony] relates[.]' " *Strong, supra,* 110 *N.J.* at 589, 542 *A.*2d 866 (quoting *Brown v. Walker,* 161 *U.S.* 591, 595, 16 *S.Ct.* 644, 646, 40 *L.Ed.* 819, 820 (1896)). Transactional immunity widely was accepted as the only form of immunity coextensive with the privilege against self-

incrimination. *Kastigar v. United States,* 406 *U.S.* 441, 452–53, 92 *S.Ct.* 1653, 1661, 32 *L.Ed.*2d 212, 221 (1972).

As we noted in *Strong, supra,* legislators viewed that form of immunity as overprotective of the privilege. 110 *N.J.* at 589, 542 *A.*2d 866. As a result, the concept of "use and derivative use" or "use and fruits" immunity was developed, a form of immunity that acts as a proscription against the use in any criminal case of compelled testimony or of any information directly or indirectly derived from that testimony. *Kastigar, supra,* 406 *U.S.* at 453, 92 *S.Ct.* at 1661, 32 *L.Ed.*2d at 222. In *Kastigar,* the Court considered a statutory grant of use and derivative-use immunity and held that

> such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. * * * The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. * * * It prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.
>
> [*Ibid.*]

When use and derivative-use immunity is granted, the State may prosecute a defendant who has been compelled to give testimony, but it may not use in that prosecution the compelled testimony or any evidence it acquired as a result of that testimony. In *Strong, supra,* acknowledging the parallel development of immunity in New Jersey, we emphasized the need for "the strictest scrutiny of and the strongest protections against possible prosecutorial misuse of testimony." 110 *N.J.* at 595, 542 *A.*2d 866. To further that goal we held that under use and derivative-use immunity, if the State seeks to offer evidence against a defendant in a prosecution that relates to criminal activity that was the subject of earlier compelled testimony, the State must prove by clear and convincing evidence that the evidence offered is wholly independent of and unrelated to that compelled testimony. *Id.* at 595–96, 542 *A.*2d 866.

## V.

Despite the absence of a clear indication of its purpose, we are persuaded that in enacting *N.J.S.A.* 2C:35–10c the Legislature intended to implement the recommendation of the Task Force on Speedy Trials by "creating [an] appropriate disorderly persons offense[ ] for possession of small quantities of certain drugs * * * to permit the use of prosecutorial discretion in the charging and screening process." *Speedy Trial Report, supra,* at 53. Notwithstanding that goal, a person "[can]not be subpoenaed to produce the gun or the loot, no matter how probable the cause, for the [privilege] protects the individual from coercion upon him to come forward with anything that can incriminate him." *In re Addonizio,* 53 *N.J.* 107, 129, 248 *A.*2d 531 (1968).

■ Thus, the mandate of subsection c must be reconciled with the privilege against self-incrimination. The subsection is susceptible to a constitutional interpretation consistent with the apparent intention of the Legislature. Because the last sentence of subsection c forecloses transactional immunity, drug dealers cannot avoid criminal liability by turning over their merchandise. However, use and derivative-use immunity is not inconsistent with the Legislature's goal of providing a downgrading option to facilitate swift adjudication. Hence, we construe subsection c to provide use and derivative-use immunity to one complying with its mandate, with the result that neither the controlled dangerous substances turned over to police in compliance with its provisions nor evidence directly or indirectly developed therefrom may be introduced into evidence in the prosecution of any other offense. Consistent with the express provisions of subsection c, however, and subject to observance of the defendant's use and derivative-use immunity, a person's compliance with subsection c does not preclude prosecution for any *other* offense involving the surrendered controlled dangerous substance—the word *other* undoubtedly referring to offenses other than offenses defined in *N.J.S.A.* 2C:35–10. In effect, we construe subsection c as providing transactional immunity for section 10 offenses to persons complying

with its provisions, and use and derivative-use immunity in respect of other offenses.

In construing *N.J.S.A.* 2C:35–10c to provide use and derivative-use immunity to any person who complies with its provisions, we note our concern about the wisdom of enacting a statute that on its face compromises the privilege against self-incrimination. Moreover, although the contention was not advanced before us, the statute also may be vulnerable to the criticism that, aside from its downgrading function, its effect is purely theoretical, as evidenced by the State's concession that the conduct criminalized has yet to be the subject of an independent prosecution for violation of subsection c. Nor are we persuaded that the downgrade function that apparently inspired the enactment of subsection c could not have been addressed more directly—for example, through the inclusion of statutory criteria pursuant to which prosecutors would be authorized to downgrade section 10a violations to disorderly-persons offenses. *Cf. State v. Vasquez,* 129 *N.J.* 189, 196, 609 *A.2d* 29 (1992) (requiring that prosecutor state on record reasons for waiving or refusing to waive parole disqualifier under *N.J.S.A.* 2C:35–12); *Lagares, supra,* 127 *N.J.* at 32, 601 *A.2d* 698 (directing adoption by Attorney General of guidelines in respect of prosecutors' applications for enhanced sentences under *N.J.S.A.* 2C:43–6f). Nevertheless, absent a clear indication to the contrary, we assume that the Legislature enacted subsection c with an understanding of the contours of the privilege against self-incrimination. Based on that assumption, we are confident that our construction of *N.J.S.A.* 2C:35–10c is consistent with and furthers the legislative goals embodied in the statute.

Defendant's conviction is not barred by his assertion of his privilege against self-incrimination. Had he voluntarily surrendered to law-enforcement officers the cocaine unlawfully in his possession, the cocaine would not have been admissible against him in any subsequent prosecution. Furthermore, the State would have had to prove, by clear and convincing evidence, that any other evidence admitted against defendant was unrelated to his surrender of cocaine. Defendant's failure voluntarily to sur-

render the cocaine to law-enforcement officers is not protected by his privilege against self-incrimination.

## VI.

Defendant contends that we should recognize a state-constitutional basis for the privilege against self-incrimination. Because we find no violation of defendant's privilege, we need not address that issue.

The judgment of the Appellate Division is reversed and defendant's conviction reinstated.

*For reversal and reinstatement*—Chief Justice WILENTZ, and Justices O'HERN, GARIBALDI and STEIN—4.

*For affirmance*—Justices CLIFFORD, HANDLER and POLLOCK—3.

POLLOCK, Justice, dissenting.

I agree with the majority that *N.J.S.A.* 2C:35–10c violates defendant's privilege against self-incrimination as guaranteed by the common law of this State and by the Fifth Amendment of the United States Constitution. I respectfully disagree, however, that engrafting use-and fruits-immunity on the statute is consistent with the legislative intent. *Ante* at 402, 627 *A*.2d at 1119. With one exception, I dissent substantially for the reasons set forth in the opinion of the Appellate Division, 256 *N.J.Super.* 413, 607 A.2d 191 (1992). The exception is that I find the statute facially unconstitutional.

One need only compare the words of the statute with the majority opinion to see that they are inconsistent. The statute states that "[n]othing in this subsection shall be construed to preclude a prosecution or conviction for any other offense defined in this title or any other statute." The majority, however, interprets this language to mean that when enacting *N.J.S.A.* 2C:35–10c, the Legislature intended to provide "transactional immunity for section 10 offenses to persons complying with its provisions,

and use and derivative-use immunity in respect of other offenses."
*Ante* at 402, 627 *A*.2d at 1119. Nothing in the history or language
of the statute supports the majority's interpretation.

To bridge the gap between the statutory language and its
construction, the majority relies on the perceived need to down-
grade drug cases to disorderly-persons offenses to relieve crimi-
nal-case congestion. The majority reasons that the statute meets
this need by permitting prosecutors to downgrade simple posses-
sion, an indictable offense, to a disorderly-persons offense. *Ante*
at 394, 627 *A*.2d at 1115. To support its reasoning, the majority
points to the Attorney General's statement at oral argument that
"no defendants have been charged with a violation of that subsec-
tion except for those defendants whose charges were downgraded
from an original charge of simple possession." *Ibid.* According
to the majority, therefore, an otherwise-unconstitutional criminal
statute is made constitutional not by enforcing it according to its
terms but by using it as a means to induce pleas to lesser offenses
for the ulterior, albeit benign, purpose of reducing court conges-
tion.

The statutory language makes clear that the Legislature intend-
ed not that the statute would be used to obtain convictions for
lesser offenses but that its use would not inhibit prosecution for
more serious offenses. Nothing supports the notion that the
Legislature considered the grant of immunity that the majority so
generously provides. The Appellate Division correctly wrote:
"[W]e cannot confidently conclude that the Legislature would have
wanted to provide this disorderly persons 'downgrade option' if it
had the potential of forestalling or impairing prosecutions for
more serious offenses." 256 *N.J.Super.* at 421, 607 A.2d 191.

As the State concedes, when the Legislature seeks to provide
immunity from prosecution for the compelled surrender of incrimi-
nating evidence, it knows how to do so. The Penal Code is replete
with statutes demonstrating that the Legislature knows how to
terminate criminal liability for compelled surrender of incrimina-
ting evidence when it so intends. *See, e.g., N.J.S.A.* 2C:5–2e

(person may terminate liability for conspiracy by renouncing further participation and by informing law enforcement of existence of conspiracy and participation in it); *N.J.S.A.* 2C:58–7 (person unlawfully possessing explosive or destructive device may terminate liability by notifying police); *N.J.S.A.* 2C:17–6b (person possessing for unlawful purpose automobile part with altered serial number is guilty *unless* he or she files statement with authorities), *as construed in State v. Davis,* 244 *N.J.Super.* 180, 581 A.2d 1333 (App.Div.1990).

Neither the majority nor the State has identified a single case in which a court, absent specific statutory authorization, has granted use immunity to override a person's assertion of the privilege against self-incrimination. Indeed, without such authorization, courts have declined to grant use immunity to override the privilege. See *Whippany Paper Board Co. v. Alfano,* 176 *N.J.Super.* 363, 370, 423 A.2d 648 (App.Div.1980) ("But under New Jersey law use immunity may be granted only in criminal cases at the request of a county prosecutor with the consent of the Attorney General or at the direct request of the Attorney General. *N.J.S.A.* 2A:81–17.3." (footnote omitted)); *see also, e.g., Kastigar v. United States,* 406 *U.S.* 441, 92 *S.Ct.* 1653, 32 *L.Ed.*2d 212 (1972) (limiting scope of immunity provided by 18 *U.S.C.A.* §§ 6002, 6003); *Murphy v. Waterfront Comm'n,* 378 *U.S.* 52, 84 *S.Ct.* 1594, 12 *L.Ed.*2d 678 (1964) (immunity provided under state law (*N.J.S.A.* 32:23–86(5)) affords immunity from state and federal prosecution); *State v. Strong,* 110 *N.J.* 583, 542 A.2d 866 (1988) (determining scope of immunity from prosecution under *N.J.S.A.* 2A:81–17.3, which prohibits State from using evidence against person that is "directly or indirectly derived" from his or her own compelled testimony); *cf. Marchetti v. United States,* 390 *U.S.* 39, 88 *S.Ct.* 697, 19 *L.Ed.*2d 889 (1968) (declining to read immunity into unconstitutional taxation statute because Court was "entirely certain that the Constitution has entrusted Congress, and not to this Court, the task of striking an appropriate balance...."). Here, however, without any legislative support, the majority has concocted a mixture of transactional, use, and derivative-use im-

munity to vitiate defendant's privilege. In sum, I believe that the majority has fashioned the statute to suit its purposes, not those of the Legislature.

I part company with the Appellate Division on the issue of the facial unconstitutionality of the statute. A statute is facially unconstitutional if "the Constitution is necessarily violated every time the law is enforced." *Ran–Dav's County Kosher, Inc. v. State*, 129 *N.J.* 141, 174–75, 608 A.2d 1353 (1992) (Stein, J., dissenting); *Steffel v. Thompson*, 415 *U.S.* 452, 474, 94 *S.Ct.* 1209, 1223, 39 *L.Ed.*2d 505, 522–25 (1974) (finding statute invalid *in toto* when "incapable of any valid application."). The critical question is not whether the State has chosen to apply the statute in a constitutionally-invalid manner but rather whether compliance with the statute is possible without self-incrimination. Subsection c applies to a person who "knowingly obtains or possesses a controlled dangerous substance or controlled substance analog in violation of subsection a...." Simply put, the statute applies only to persons who *unlawfully* possess the drugs. To comply with subsection c, a defendant must admit commission of the more serious offense of possession. *N.J.S.A.* 2C:35–10a. As the majority concedes: "A possessor will be providing law-enforcement authorities with tangible evidence that he or she is guilty of possession and perhaps more serious offenses." *Ante* at 398, 627 A.2d at 1117. Compliance with the statute necessarily provides incriminating evidence of more serious crimes. In every instance in which a person complied with the statute, the application of the statute would violate that person's privilege against self-incrimination. The statute, therefore, is facially invalid.

Justices CLIFFORD and HANDLER join in this opinion.