271 N.J. Super. 577 (1994)
639 A.2d 305
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
RICHARD IRIZARRY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 7, 1993.
Decided March 1, 1994.
*580 Before Judges BRODY, STERN and KEEFE.
John S. Redden, Deputy First Assistant Prosecutor, argued the cause for appellant (Clifford J. Minor, Essex County Prosecutor, attorney).
Joseph E. Krakora, Deputy Public Defender II, argued the cause for respondent (Zulima V. Farber, Public Defender, attorney).
Paul H. Heinzel, Deputy Attorney General, argued the cause for amicus curiae Attorney General's Office (Fred DeVesa, Acting Attorney General, attorney).
The opinion of the court was delivered by KEEFE, J.A.D.
We granted the State's motion for leave to appeal an interlocutory order of the Law Division in this capital murder case to decide the following questions:
I. DOES PROTECTION OF DEFENDANTS PRIVILEGE AGAINST SELF-INCRIMINATION REQUIRE DISQUALIFICATION OF THE ENTIRE ESSEX COUNTY PROSECUTOR'S OFFICE?
II. DOES THE FACT THAT A DEFENDANT MAY CALL A MEMBER OF THE PROSECUTOR'S OFFICE AS A DEFENSE WITNESS DURING A PENALTY PHASE PROCEEDING CREATE AN ETHICAL BAR TO THE PROSECUTOR'S OFFICE REPRESENTATION OF THE STATE?
III. DID THE TRIAL COURT EXCEED ITS AUTHORITY IN MANDATING THAT THE ATTORNEY GENERAL SUPERSEDE THE COUNTY PROSECUTOR AND ASSUME RESPONSIBILITY FOR PROSECUTING THIS CAPITAL MURDER CASE?
Defendant Richard Irizarry was charged with capital murder, and other lesser offenses, for his part in the February 7, 1990 killing of Angel Laboy (Laboy). On March 2, 1990, defendant *581 provided a statement to the police. In that statement, defendant asserted that on February 7, 1990, he was approached by co-defendant Julius Boeglin, who told defendant that he wanted Laboy killed because Laboy was talking too much about Boeglin's drug business, and owed Boeglin $1,800. Boeglin offered defendant $1,000 if he would perform the killing.
Renee Taylor (Boeglin's girlfriend), Boeglin and defendant drove to a pizzeria, where, while they were still in the car, Boeglin pointed Laboy out to defendant. Boeglin gave defendant a gun and told him to "get him now." Defendant stated that, before he hesitantly got out of the car, Boeglin, with another gun in his hand, told him that he would be watching him. Defendant asserted: "The way [Boeglin] told me, he made me feel like he was gonna shoot me...."
Defendant got out of the car and called out Laboy's name. Laboy turned and, when he saw what defendant was about to do, told defendant that Boeglin would kill him as well. At that point, defendant stated that he pulled the gun out from his coat pocket and shot Laboy five or six times.
The trials of defendant and Boeglin were severed because both provided statements that the State intended to use at trial. Defendant's trial was scheduled to take place first. However, before the commencement of his trial, defendant's attorney, First Assistant Deputy Public Defender Joseph Krakora (Krakora), approached Assistant Prosecutor Leslie J. Mann (Mann), the attorney assigned to try the case for the State, and stated that defendant was willing to testify on behalf of the State against Boeglin if given use immunity. Mann discussed this proposal with the Director of the Prosecutor's Homicide Squad, Norman W. Menz, Jr. (Menz). Based on that discussion, Mann advised Krakora that the State would not offer defendant any consideration in exchange for his testimony, and that the State intended to fully prosecute defendant for capital murder. Krakora indicated to Mann that he understood the State's position. However, both Krakora and Mann agreed that defendant's cooperation would be *582 evidence that could be used to establish the mitigating factor set forth in N.J.S.A. 2C:11-3c5(g) should defendant be convicted of capital murder.
Because of defendant's willingness to testify, the order of trials was switched, with Boeglin's trial now scheduled first. The trial court granted the State's petition for immunity, pursuant to N.J.S.A. 2A:81-17.3, and defendant testified at Boeglin's trial. Boeglin was convicted of non-capital murder.
After the completion of Boeglin's trial, Krakora sought to negotiate a plea on behalf of defendant. Krakora offered to have defendant plead guilty to aggravated manslaughter. Mann discussed the offer with Menz, who rejected it because it was too lenient for a "hired killer." However, Mann was authorized to convey a counter-offer to Krakora; namely, a plea to non-capital murder with the understanding that such a plea would have to be approved by Essex County Prosecutor Clifford Minor (Minor).
Sometime later, a meeting was held between Mann, Menz, Deputy First Assistant Prosecutor John Redden, Minor, First Assistant Prosecutor Peter J. Francese, Krakora and Deputy Public Defender Michael Marucci. The purpose of the meeting was to discuss a negotiated plea for defendant. Krakora urged Minor to accept the offer of a plea to aggravated manslaughter in recognition of defendant's cooperation. The offer was rejected. However, Mann was later authorized by Minor to offer a plea to non-capital murder to defendant. Krakora rejected the offer, and, after doing so, filed this motion to disqualify the Essex County Prosecutor's Office.
At the hearing on the motion, defendant alleged that the prosecutor's office had used the immunized testimony to prepare its trial strategy and in its plea bargain negotiations. He asserted that the supervisors of the prosecutor's office were all aware of defendant's immunized testimony before they decided on what plea to offer. Defendant further asserted that an attempt to build a "Chinese wall" around a new assistant prosecutor would be ineffective because it would be unrealistic to think that the new *583 prosecutor would not be exposed in some way to the immunized testimony, especially in light of the fact that this was a capital case. Moreover, defendant maintained that if approval was necessary for any decisions concerning the trial, the new assistant prosecutor would be receiving that approval from a supervisor who had been exposed to the immunized testimony.
The defendant also argued that a conflict of interests would exist if an Assistant Essex County Prosecutor, presumably the one who prosecuted Boeglin, testified in the penalty phase concerning the substantial nature of defendant's cooperation while the office itself maintained that defendant was guilty of capital murder. Finally, defendant argued that the State would in no way be prejudiced if a different prosecutor's office handled the case, especially in light of the Fifth Amendment implications resulting from his immunized testimony.
The State countered by arguing that this case did not require disqualification because defendant's statement, which took place before his immunized testimony, contained all the information necessary to prosecute defendant. The State noted that while the testimony given at Boeglin's trial was substantially greater in length than the three page statement defendant gave to the police, the substance of the testimony was not materially different.
The State discounted defendant's argument that the immunized testimony was used by the prosecutor's office in its plea negotiations, noting that defendant's offer to testify was met by the State's assertion that, if he did, no consideration would be given in view of defendant's status as a hired killer. The State further asserted that there was no case law to support the disqualification of an entire prosecutor's office under the circumstances of this case.
Regarding the conflict issue, the State argued that Mann, who was no longer assigned to the case, would be available to testify at the penalty phase, and that the petition presented to the court seeking immunity for the defendant could speak for itself in the unlikely event that Mann would try to "color" his testimony. The *584 State also argued that determining whether defendant's testimony at the earlier trial amounted to "substantial" cooperation did not depend on someone from the prosecutor's office taking the stand, but could be testified to by, for example, an expert in criminal law.
The motion judge rejected defendant's primary argument that the prosecutor's office must be disqualified as a matter of law on the theory that defendant's immunized testimony necessarily had to be used by the prosecutor in refusing defendant's plea offer. However, the judge recognized that the problem was not solved simply because a new assistant prosecutor, without any knowledge of defendant's immunized testimony, was selected to try the case.
While the Prosecutor, as I've indicated asserts in their brief that there appears to be no Kastigar problems, because of the removal of Prosecutor Mann and the appointment of a new prosecutor, this Court at this posture does not find that there is any clear and convincing evidence that would require  or that would allow the prosecutor to continue without a Kastigar hearing. Certainly the affidavit from the new assistant prosecutor does indicate clearly that he had no involvement, but there are other issues that will have to be addressed in this Court's opinion at a Kastigar hearing if the Prosecutor's Office is to remain in this case.
However, the judge accepted defendant's alternate theory that the Essex County Prosecutor's Office should be disqualified based on the conflict of interest issue. Citing Rules of Professional Conduct 3.7, 1.7, 1.9 and 1.10, as well as In re Petition for Review of Opinion Number 569 of the Advisory Committee on Professional Ethics, 103 N.J. 325, 511 A.2d 119 (1986), Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 536 A.2d 243 (1988), Lawler v. Isaac, 249 N.J. Super. 11, 592 A.2d 1 (1991), and State v. Bey, 112 N.J. 45, 548 A.2d 846 (1988), the motion judge said the following:
This Court is satisfied that because of the nature of this case, that is it's a capital murder case, that because of the fact that the defendant did testify in a previous proceeding prosecuted by the Essex County Prosecutor's Office resulting in a conviction of the co-defendant, Boeglin, that there is potentially an appearance of conflict for the Prosecutor's Office to remain as the prosecuting authority of this case.
The judge ended the hearing by concluding that the Essex County Prosecutor's Office should be disqualified, and signed an order to that effect on August 6, 1993. We granted the State's motion for leave to appeal.

*585 I
N.J.S.A. 2A:81-17.3 prohibits the prosecutor from using
testimony or evidence, or any information directly or indirectly derived from such testimony or evidence, .. . against the person in any proceeding or prosecution for a crime or offense concerning which he gave answer or produced evidence under court order.
The statute affords "use and derivative use" immunity which was sanctioned by the United States Supreme Court in Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212, reh'g denied, 408 U.S. 931, 92 S.Ct. 2478, 33 L.Ed.2d 345 (1972). In Kastigar, the Court determined that a statute which offered use and derivative use immunity was coextensive with the Fifth Amendment privilege against self-incrimination, and, as such, was sufficient to compel testimony over a claim of privilege. Id. 406 U.S. at 453, 92 S.Ct. at 1661, 32 L.Ed.2d at 222. The purpose of the Fifth Amendment bar against the use of immunized testimony is to "`leave[] the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege' in the absence of the grant of immunity." Id. at 458-59, 92 S.Ct. at 1664, 32 L.Ed.2d at 225 (quoting Murphy v. Waterfront Comm'n, 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678, 694 (1964)). That purpose is not automatically frustrated simply because the government has been exposed to immunized testimony. United States v. Serrano, 870 F.2d 1, 17 (1st Cir.1989); United States v. Crowson, 828 F.2d 1427, 1430 (9th Cir.1987), cert. denied, 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988); United States v. Pantone, 634 F.2d 716, 720 (3d Cir.1980). But cf. United States v. McDaniel, 482 F.2d 305, 311 (8th Cir.1973) (where Assistant United States Attorney read defendant's testimony well in advance of trial without knowing that it was immunized, "the government is confronted with an insurmountable task in discharging the heavy burden of proof imposed by Kastigar").
However, a person afforded use and derivative use immunity "is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities." United States v. Kastigar, supra, 406 U.S. at 460, 92 S.Ct. at 1665, 32 *586 L.Ed.2d at 226. The prosecution has the burden of establishing that its evidence is not tainted by information derived from immunized testimony. More specifically,
[t]his burden of proof ... is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

[Ibid.]
Our Supreme Court adopted the principles of Kastigar in State v. Strong, 110 N.J. 583, 542 A.2d 866 (1988). In doing so, the Court noted that the emphasis of Kastigar "was that a subsequent prosecution may be constitutionally allowed as long as it `insures that the testimony cannot lead to the infliction of criminal penalties on the witness.'" Id. at 590, 542 A.2d 866 (quoting United States v. Kastigar, supra, 406 U.S. at 453, 92 S.Ct. at 1661, 32 L.Ed.2d at 222). The Strong Court also observed, however, that the general standards of Kastigar did not provide specific guidance for determining applications stemming from use and derivative use immunity, and, thus, the Court set out to "consider the factors that should govern a determination of whether evidence used in a subsequent prosecution is sufficiently untainted by earlier compelled testimony." Id. 110 N.J. at 593, 542 A.2d 866. See also United States v. Pantone, supra, 634 F.2d at 719 ("It has been left to the lower courts to define the exact contours of the standards that the government must meet in varying contexts before evidence will be deemed untainted by association with compelled testimony.").
With this in mind, the Strong Court stated that
the burden of proof imposed on the State must be by "clear and convincing" evidence. No less a burden of proof will suffice to entitle the State to engage in a prosecution of a witness who has given earlier compelled testimony under a government grant of immunity.

[State v. Strong, supra, 110 N.J. at 596, 542 A.2d 866.]
The Court went on to note that prosecutorial use of immunized testimony "may take a variety of forms." Id. at 606, 542 A.2d 866. *587 Quoting an Eighth Circuit case, the Court recognized that such use
could conceivably include assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy.

[Ibid. (quoting United States v. McDaniel, supra, 482 F.2d at 311).][1]
The Court then acknowledged other cases which stood for the proposition that prosecutorial use of immunized testimony at a later trial was inferred, and that "a heavy burden of proof is placed on the state to negate this inference of prosecutorial use." Ibid. (citing United States v. Semkiw, 712 F.2d 891 (3d Cir.1983); United States v. Dornau, 359 F. Supp. 684 (S.D.N.Y. 1973)). Moreover, the Court recognized that a similarly heavy burden is placed on the State to show that any pre-trial investigation was insulated from use of any compelled materials. Ibid. (citing United States v. Smith, 580 F. Supp. 1418 (D.N.J. 1984); United States v. Hossbach, 518 F. Supp. 759 (E.D.Pa. 1980)).
The State maintains that no case law exists which stands for the proposition that an entire prosecutor's office should be disqualified simply because some members of the office are familiar with immunized testimony proferred by defendant. The State argues that a Kastigar hearing should have been held to determine if the immunized testimony was used in the prosecutor's trial strategy or plea-bargain negotiations as defendant has alleged, and that the trial court's decision to oust the entire office based only on a motion to disqualify was improper. The State also *588 points to the fact that the trial judge at oral argument on the motion seemed to reject defendant's argument that the immunized testimony was used in plea negotiations, yet still determined that the entire office should be disqualified. Further, the State asserts that the practice of assigning the case to another assistant prosecutor within the same office who was isolated from the contents of the immunized testimony was sufficient to insure that the immunized testimony was not used to incriminate defendant.
At oral argument in this matter defendant agreed that a Kastigar hearing is necessary if we disagree with his argument, as did the trial judge, that the prosecutor's office necessarily had to use defendant's immunized testimony in plea negotiations. Our independent review of the record satisfies us that the trial judge was correct in his assessment of that issue. Although the State has the burden of proof at a Kastigar hearing, it seems logical that when defendant seeks to disqualify the prosecution without a hearing on the grounds recognized in Strong, the facts must be so clear as to lead to only one conclusion. That is not the case here.
There is no evidence that defendant's immunized testimony was actually used in plea-bargain negotiations. The affidavits of record indicate that defendant was told before he was granted immunity that he would not be given any consideration (except for the establishment of a possible mitigating factor) in exchange for his testimony. Specifically, the State's position was the same before and after defendant's testimony as to defendant's offer to plead to aggravated manslaughter. The State has consistently maintained that a plea to aggravated manslaughter is too lenient for a hired killer. The record further indicates that defendant testified at the Boeglin trial that no deal between him and the prosecutor had been made in exchange for his testimony, and that he was merely hopeful that his testimony would enable him to plead to aggravated manslaughter.
Moreover, the record reveals that defendant was actually placed in a better position in terms of plea negotiations after his testimony in that Prosecutor Minor authorized a plea of non-capital *589 murder. Finally, the record indicates that the investigation was completed and the evidence fully developed before defendant's immunized testimony was ever given.
At a minimum, a Kastigar hearing must be held in order to determine if defendant's immunized testimony was used in some way prohibited by State v. Strong, supra. In Strong, the Supreme Court remanded the case to the trial court for consideration of whether the prosecutor utilized defendant's compelled testimony even though "the record suggest[ed] that the prosecutor not only was directly exposed to [defendant's] immunized testimony but may have made actual use of it in preparing the case against [defendant]." Id. 110 N.J. at 607, 542 A.2d 866. If a hearing was required under those circumstances, then one is surely required under the facts of this case. We do not understand the motion judge's decision to be in disagreement with our position on this point.
The next question to be resolved is whether, as the State argues, the use of a new assistant prosecutor who has no knowledge of defendant's immunized testimony is enough to insure that taint is not present. Federal court judges are not of one mind on the subject. Several circuits suggest that prosecuting attorneys need not be disqualified from trial proceedings even if they were broadly exposed to the defendant's immunized testimony. For example, in United States v. Palumbo, 897 F.2d 245 (7th Cir.1990), the court stated:
[W]e are unwilling to disqualify [the Assistant United States Attorney] from future proceedings related to this case. Such an approach is neither demanded by our caselaw nor necessary to protect [defendant's] due process rights: Kastigar already requires the government to shoulder the heavy burden "of proving that all of the evidence it proposes to use was derived from legitimate independent sources."... If [the Assistant] pursues another indictment in this case, he will have to demonstrate that the evidence used to obtain the indictment was derived from independent sources. Should he be unable to make this affirmative showing, the court will again dismiss the indictment. True enough, in order to avoid the use of immunized testimony (as well as the appearance of taint), it may be wise for the government to ask another attorney to take over this case. But that is the government's decision to make, not ours.

*590 [Id. at 251.]
In United States v. Crowson, supra, 828 F.2d 1427, while the court noted that "the government might easily remove any cloud from the trial by assigning the case to another attorney who has not been exposed to the immunized testimony[,]" it nonetheless explained that "there is no per se rule requiring the withdrawal of a prosecutor ... who may have been exposed to immunized testimony." Id. at 1429-30. In United States v. Caporale, 806 F.2d 1487 (11th Cir.1986), cert. denied, 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987), the court articulated the following:
The essence of [defendant's] argument is that the government can never establish an independent source when the prosecutor has read the immunized testimony prior to trial. The focus of the inquiry under Kastigar, however, is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against defendant.

[Id. at 1518.]
Accord United States v. Mariani, 851 F.2d 595 (2d Cir.1988), cert. denied, 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989); United States v. McGee, 798 F. Supp. 53 (D.Mass. 1992).
In other circuits, it has been suggested that replacing the attorney who had been exposed to immunized testimony with one who was not was an acceptable means of removing taint. For example, the Second Circuit, in United States v. Schwimmer, 882 F.2d 22 (2d Cir.1989), cert. denied, 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990), observed the following:
Without deciding the issue, it would appear prudent for the government ... to establish a so-called "Chinese Wall" between its prosecutors exposed to the present grand jury testimony ... and those prosecutors who may be assigned to retry defendant.

[Id. at 26.]
In United States v. Byrd, 765 F.2d 1524 (11th Cir.1985), the court stated:
In a Kastigar setting, we are of the firm opinion that it would be unwise to permit an attorney familiar with the immunized testimony to participate in the trial or preparation of the case.

*591 [Id. at 1532 n. 11.]
In United States v. Semkiw, supra, 712 F.2d 891, the Third Circuit asserted:
[T]he government might easily have removed any cloud from the trial by assigning it to another attorney who did not and would not review the immunized testimony.

[Id. at 895.]
Finally, in New Jersey, the Strong Court, in a footnote, stated:
We do not in this case address the specific question whether a prosecutor who has become familiar with compelled testimony must thereafter be insulated from a later participation in the prosecution of the witness. It may be observed, however, that the subtle and difficult fact issues in this case involving actual prosecutorial use of such compelled testimony could be eliminated or substantially reduced if such prosecutors were to remove themselves from the case.
[State v. Strong, supra, 110 N.J. at 607 n. 6, 542 A.2d 866.]
See also In re Petition to Compel Testimony of Tuso, 73 N.J. 575, 581, 376 A.2d 895 (1977) (Court's conclusion that defendant was not stripped of his constitutional rights by being required to testify at grand jury of a separate defendant was buttressed by the fact that the State planned to use a different Deputy Attorney General before that grand jury from the one assigned to try defendant.).
We have found no case that stands for the proposition that an entire prosecutor's office should be disqualified because some members of the office are familiar with the immunized testimony of a defendant. Further, the consensus appears to be that it is not the court's place to dictate who should prosecute the case before a Kastigar hearing is conducted. If the State believes that the same prosecutor should handle the case because all of the evidence was derived from independent sources, then it should be allowed to make that decision. The Kastigar hearing will determine whether the evidence to be presented was truly independent of the immunized testimony. While substituting an assistant prosecutor with no knowledge of the immunized testimony for one who does have knowledge would seemingly be an effective step to bolster the State's position that no taint is present, that too is only *592 one factor in the overall equation which the Kastigar hearing is designed to resolve. To the extent that the State's decision impacts adversely on defendant's right against self-incrimination, the courts will intervene to protect that right.

II
The State argues that there is no conflict or appearance of conflict by having a member of the same prosecutor's office who tries the defendant testify as a defense witness at the penalty phase of defendant's trial. The State maintains that the cases cited by the motion judge all deal with attorney "side-switching," and, thus, are inapplicable in this case because "[n]o attorney is representing diverse or conflicting interests and no attorney is in a position in which he or she might divulge confidential information obtained from a former client."
The State also asserts that there is nothing in R.P.C. 3.7 which would disqualify an entire prosecutor's office simply because one member of that office may be called to testify as a defense witness. Moreover, the State argues that no member of the prosecutor's office is a "necessary witness" within the meaning of R.P.C. 3.7 because defendant's assistance in the prosecution of Boeglin is public record and can be proved by witnesses other than members of the prosecutor's office. Further, the State asserts that this case does not fall under R.P.C. 1.7 or R.P.C. 1.9 (which are referred to by and incorporated into R.P.C. 3.7) because those rules deal with the representation of clients with conflicting interests.
The Attorney General, in its amicus brief, argues that even if it could be assumed that there was a conflict or appearance of conflict, such conflict or appearance of conflict would not be removed by requiring some other prosecutorial agency to take the case because the interests of the Essex County Prosecutor's Office and any other prosecutorial agency are the same.
The defendant, on the other hand, asserts that the trial judge's disqualification of the prosecutor on ethical grounds was warranted. *593 Defendant argues that, absent disqualification, witnesses called from the Essex County Prosecutor's Office will be placed in a conflict position because they will be asked to testify on an outcome inconsistent with their employer's wishes, and, under such circumstances, a chilling effect may be placed upon their testimony. Defendant maintains that it is not enough for him to prove at the penalty phase that he in fact cooperated; instead, members of the prosecutor's office must take the stand in order to show that defendant's cooperation was substantial. The defendant argues that, at a minimum, this creates an appearance of impropriety.[2]
The narrow issue presented, whether an entire prosecutor's office must be disqualified from a capital case because certain members of that office may be called by the defendant to testify at the penalty phase of the proceedings, is one of first impression. See Prosecuting Attorney as Witness, 54 A.L.R.3d 100.
The motion judge began his decision on this point by discussing R.P.C. 3.7, which provides as follows:
(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work substantial hardship on the client.
(b) A lawyer may act as an advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by R.P.C. 1.7 or R.P.C. 1.9.
In this case, R.P.C. 3.7(a) is not applicable: any member of the Essex County Prosecutor's Office who would be called as a witness *594 to testify concerning the nature and extent of defendant's assistance in the trial of Boeglin would not act as an advocate in the case against defendant because defendant's case has been assigned to a new assistant prosecutor who has been shielded from defendant's immunized testimony and related matters.
Thus we turn to R.P.C. 3.7(b), and, more importantly, to R.P.C. 1.7 and R.P.C. 1.9, both of which are incorporated therein. R.P.C. 1.7, in part, states:
(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless:
(1) the lawyer reasonably believes that representation will not adversely affect the relationship with the other client; and
(2) each client consents after a full disclosure of the circumstances and consultation with the client, except that a public entity cannot consent to any such representation.
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents after a full disclosure of the circumstances and consultation with the client, except that a public entity cannot consent to any such representation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.
R.P.C. 1.9 states:
(a) A lawyer who has represented a client in a matter shall not thereafter:
(1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation with the former client; or
(2) use information relating to the representation to the disadvantage of the former client except as RPC 1.6 would permit with respect to a client or when the information has become generally known.
(b) The provisions of RPC 1.7(c) are applicable as well to situations covered by this rule.
The language of R.P.C. 1.7(a) and (b), which deals with conflicts of interest that occur when a lawyer's representation of one client is limited because of the adverse effect it may have on another client or because of responsibilities that the attorney owes to *595 another client or a third party, is not applicable in this case. Specifically, R.P.C. 1.7 is not applicable because a member of the prosecutor's office who represents the State in a criminal prosecution where a member of the office is called to testify in favor of defendant at the penalty phase is not "represent[ing] a client" (the State) in a manner which is "adverse to another client." The defendant is not a "client" of either the witness or the prosecuting attorney. Nor would such representation create a situation where the prosecutor's representation of the State is "materially limited" by the attorney's responsibility to a third person. The prosecuting attorney has no responsibility to a third person that is impacted by having an assistant prosecutor from the same office testify. Here the "responsibility" to the defendant arises out of the witness attorney's oath to tell the truth, not out of an ethical obligation to the defendant.
The same can be said for R.P.C. 1.9. The language of that rule makes clear that it addresses conflicts created when an attorney represents one client to the detriment of a former client, or uses information gained from a prior representation in a subsequent matter to the client's detriment. That is simply not the situation presented by the circumstances of this case. The facts known to the prosecutor/witness concerning defendant's cooperation are essentially matters of public record, and do not constitute the type of information that R.P.C. 1.9 seeks to protect.
Determining that the prosecutor's testimony in this case would present no actual conflict under R.P.C. 1.7(a) and (b) or R.P.C. 1.9, however, does not end the inquiry. We must also consider whether an appearance of impropriety exists that would warrant disqualification of the entire prosecutor's office in this case. The appearance of impropriety is discussed in R.P.C. 1.7(c)(2), which states:
(c) This rule shall not alter the effect of case law or ethics opinions to the effect that:
....
(2) in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those *596 situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.

[R.P.C. 1.7(c)(2) (emphasis added).]
We assume that by incorporating R.P.C. 1.7(c) into the R.P.C. 3.7 Lawyer As Witness rule, the phrase "multiple representation" in R.P.C. 1.7(c) necessarily takes on a different meaning. In the context of this case and the words of R.P.C. 1.7(c), the issue posed is whether "an ordinary knowledgeable citizen acquainted with the facts would conclude that [the Essex County Prosecutor's Office's representation of the State and a member of its staff's appearance as a witness for an adverse party] poses a substantial risk of disservice to ... the public interest[.]"
The trial judge cited two cases which discuss the appearance of impropriety: Dewey v. R.J. Reynolds Tobacco Co., supra, 109 N.J. 201, 536 A.2d 243, and Lawler v. Isaac, supra, 249 N.J. Super. 11, 592 A.2d 1. However, Dewey and Lawler do not shed any insight into the issue. They are typical multiple representation cases. Both Dewey and Lawler deal with a situation where an attorney who represents one side in a civil litigation switches to a firm representing the other side. There is no side-switching here. Rather, members of the prosecutor's office will simply be subpoenaed to testify as witnesses.
A more instructive case is In re Opinion No. 569, supra, 103 N.J. 325, 511 A.2d 119, also cited by the trial court. In that case, the issue was whether a former deputy attorney general who had represented various state professional and occupational licensing boards could represent a licensee who faced possible disciplinary action by one of those boards as a result of an investigation begun while the former deputy attorney general was still employed by the State, but of which the former deputy attorney general had no knowledge.
Writing for the Court, Justice Garibaldi noted that the Court had a long history of requiring attorneys to avoid even the *597 appearance of impropriety, and that an actual conflict of interests was not necessary in order for an attorney to be disqualified. Id. at 329-30, 511 A.2d 119. See State v. Rizzo, 69 N.J. 28, 30, 350 A.2d 225 (1975) ("[A] lawyer must avoid even the appearance of impropriety ... to the end that the image of disinterested justice is not impoverished or tainted."); State v. Galati, 64 N.J. 572, 576, 319 A.2d 220 (1974) ("[W]e must notice that in matters of ethics and professional probity, the cause and effect impact upon the public consciousness is almost, perhaps quite, as important as the actual fact."). Indeed, "[t]he `appearance' doctrine is intended not to prevent any actual conflicts of interest but to bolster the public's confidence in the integrity of the legal profession." In re Opinion No. 569, supra, 103 N.J. at 330, 511 A.2d 119 (citing In re Cipriano, 68 N.J. 398, 403-04, 346 A.2d 393 (1975)). Justice Garibaldi also noted, however, that the "appearance" of impropriety must be something more than a "fanciful possibility," and that a claim of impropriety must have some reasonable basis. Ibid. (citing Higgins v. Advisory Comm. on Professional Ethics, 73 N.J. 123, 373 A.2d 372 (1977)).
Turning its attention to government attorneys in particular, the Court stated that their conduct must be even more circumspect than the conduct of private attorneys because government attorneys are "invested with the public trust and because they are more visible to the public." Ibid. See In re Opinion No. 653 of Advisory Committee on Professional Ethics, 132 N.J. 124, 130-31, 623 A.2d 241 (1993) (citation omitted) ("Attorneys ... who serve as counsel to government entities ... must ... be especially vigilant in avoiding `not only direct conflicts of interest, but any situations which might appear to involve a conflict of interest.'").
The Court continued by stating:
It is therefore the viewpoint of the public from which this Court has chosen to judge whether particular conduct would constitute the appearance of impropriety. "We must view the conduct as an informed and concerned private citizen and judge whether the reputation of the Bar would be lowered if the conduct were permitted."

*598 [In re Opinion No. 569, supra, 103 N.J. at 331, 511 A.2d 119 (citation omitted).]
See In re Opinion No. 653, supra, 132 N.J. at 130, 623 A.2d 241 ("[U]nder our law the appearance of impropriety is determined not from the perspective of the attorney involved but from the public's vantage.").
Applying those principles to the facts of the case before them, the Court concluded that there was a "high risk" of impropriety if the former deputy attorney general represented the licensee before the board which the attorney formerly served. In re Opinion No. 569, supra, 103 N.J. at 331, 511 A.2d 119. While the Court stated that it accepted the claim that the former deputy attorney general had no contact with the individuals who actually gathered the information regarding the case, it was concerned that the average citizen would not perceive the distinction. Ibid. Therefore the Court concluded that the former deputy should not be allowed to represent the client. Id. at 333, 511 A.2d 119.
It must be understood in applying the rationale of the foregoing opinion to another set of facts that the public perception the Court was seeking to vindicate was rooted in "`the potential misuse of information and power gained [by the attorney] when the public itself, rather than a private party is suffering the consequences.'" Id. at 331, 511 A.2d 119 (quoting Developments in the Law  Conflicts of Interest, 94 Harv.L.Rev. 1244, 1416 (1981) (citation omitted)).
In this case, the appearance of impropriety has been hypothecated by defendant in two ways. First, there may be a public perception of impropriety in that members of the office who just prosecuted defendant at the guilt phase are now testifying in his favor at the penalty phase. Second, an appearance of impropriety may be present due to the fact that an assistant prosecutor, who is being paid by the prosecutor's office, is now testifying in support of an interest which directly contradicts his employer's position, thus creating a possible "chilling effect" regarding his testimony. *599 Neither of these scenarios implicates the concern addressed by the Supreme Court in In re Opinion No. 569, supra.
The "reputation of the Bar" would not be lowered by an assistant prosecutor taking the stand to testify concerning the facts known to him or her as to the defendant's cooperation in a previous trial.[3] A properly instructed jury, and an informed public, will understand that the duty of the prosecutor is to do justice in the individual case, and must disclose evidence beneficial to the defendant to that end. Such duty is particularly acute in a capital murder case. State v. Rose, 112 N.J. 454, 548 A.2d 1058 (1988).
For the same reason, the argument that an appearance of impropriety may be present because an assistant prosecutor is asked to testify in support of a position directly at odds with the position of his employer does not merit disqualification. There are additional reasons supporting this conclusion: first, the argument assumes that employees of the prosecutor's office will not testify truthfully while under oath. Second, the argument assumes that the Essex County Prosecutor's Office is not involved in the case to see that justice is done  a goal which would be accomplished by its employees testifying truthfully as to defendant's prior cooperation  but to "win" the case by insuring that the defendant receives a sentence of death. There is no support in the record for such an assumption. The Essex County Prosecutor's Office, by offering a plea to non-capital murder, has already taken the position that the public interest would be served by such a result. Thus, members of the prosecutor's staff giving testimony favorable to a non-capital *600 sentence would not be acting inconsistent to their employer's wishes.
Turning to other jurisdictions involving similar but not identical facts, numerous courts have held that disqualification of an entire prosecutor's office is not warranted when a defendant seeks to call a member of the prosecutor's office as a witness. See State v. Doran, 105 N.M. 300, 731 P.2d 1344, 1349 (App. 1986), cert. denied, 105 N.M. 290, 731 P.2d 1334 (1987) (court upholds denial of defendant's motion to disqualify entire prosecutor's office based on his request to call an assistant prosecutor as a witness at trial); State v. Browning, 666 S.W.2d 80, 86-87 (Tenn.Cr.App. 1983) (district attorney's office was not required to disqualify itself merely because one member of the office had sat in on police interviews with defendant and was called by defendant as a witness); People v. Superior Court of San Luis Obispo County, 84 Cal. App.3d 491, 148 Cal. Rptr. 704, 710 (1978) ("The general rule is that a district attorney's office should not be recused from a case merely because one or more of its members will be called as witnesses for the defense."). See also 54 A.L.R.3d 100, supra.
In Love v. Superior Court of Sacramento County, 111 Cal. App.3d 367, 168 Cal. Rptr. 577 (1980), the defendant moved to disqualify the entire district attorney's office because one of the deputy district attorneys that was originally assigned to assist with his case had worked on defendant's case as part of his previous employment with the public defender's office. Defendant asserted that an appearance of impropriety was present because he might call the deputy district attorney as a witness.
The Love court rejected out of hand defendant's contention that the entire district attorney's office should be disqualified merely because defendant planned to call a member of the office as a witness. Id., 111 Cal. App.3d 367, 168 Cal. Rptr. at 579. However, the court determined that an appearance of impropriety would exist if the deputy or the other five members of his prosecution "team" were to remain on the case:

*601 The appearance of impropriety in such a situation is indeed serious. While we believe ... that no actual impropriety took place, the appearance of impropriety is manifest and must be minimized or eliminated. We conclude that a recusal order is necessary [as to the assistant and the other members of his team].

[Id., 111 Cal. App.3d 367, at 581.]
As to disqualification of the entire district attorney's office, the court said the following:
It does not follow that recusal of the entire district attorney's office is necessary.... The testimony at the hearing on motion for recusal indicated that there are 95 attorneys in the office. Of these only the five assigned to the major crimes section had a working relationship with [the deputy in question]. There are many experienced deputies in the office, other than those five, who are capable of prosecuting felony cases and to whom the prosecution of petitioner could be assigned. Recusal only of the attorneys in the major crime section while [the deputy] was assigned there ... would avoid the appearance of impropriety. Thus the People's duly elected public prosecutor would still be responsible for the prosecution [and] the Attorney General would not be required to take on the responsibility for prosecution....

[Ibid.]
In light of the foregoing discussion we decline to disqualify the Essex County Prosecutor's Office. Additionally, we observe that disqualification of the entire prosecutor's office would set a dubious precedent in that disqualification would be required each time a defendant attempted to obtain the benefit of the N.J.S.A. 2C:11-3c5(g) mitigating factor, or endeavored to call a prosecutor as a witness. If we accept defendant's contention that only members of the prosecutor's office could effectively opine as to the substantiality of defendant's prior cooperation, then disqualification would be warranted in every such case. Such a rule could adversely impact on future defendants in that a prosecutor's office might be unwilling to grant use immunity to defendants whose testimony is not absolutely necessary to the State, knowing that allowing such testimony will disqualify the office.

III
The Attorney General argues that the trial judge exceeded his authority by mandating that the Attorney General's Office take *602 responsibility for the case against defendant. We need not address the issue in light of our reversal of the disqualification order.
However, we note that the order under review in this case states only that the Essex County Prosecutor's Office is disqualified. It does not expressly state that the Attorney General's Office or any other prosecuting agency is ordered to continue the case.
The order under review is reversed, and the matter is remanded for a Kastigar-Strong hearing.
NOTES
[1] The State, citing United States v. North, 910 F.2d 843 (D.C. Cir.1990), argues that "there has been disagreement as to whether the exclusion extends to so-called `non-evidentiary' uses such as focusing an investigation, deciding whether to file charges or to plea bargain, and planning trial strategy." Indeed, the circuit courts are split on whether non-evidentiary issues are covered. See id. at 857. However, based on the Strong Court's use of the language from McDaniel, it appears that New Jersey extends immunity to the non-evidential uses mentioned above.
[2] In response to this argument, the State notes that defendant's immunity petition was executed by then Acting Prosecutor James F. Mulvihill, and, therefore, all Essex County Assistant Prosecutors were, at the time, Special Deputy Attorneys General. Moreover, the State points out that Mulvihill is still an Assistant Attorney General and is Director of the Division of Criminal Justice. Therefore, the State asserts that if there truly is a chilling effect and an appearance of impropriety, it will not be avoided by substituting the Attorney General's Office for the Essex County Prosecutor's Office.
[3] There is no indication that any prosecution staff member has volunteered to offer an "opinion" that defendant's cooperation has been "substantial." Rather, the representation has been that defendant will subpoena one or more staff members. Ordinarily, a subpoenaed witness may not be compelled to give opinion testimony. See, Graham v. Gielchinsky, 126 N.J. 361, 369-74, 599 A.2d 149 (1991) (Even where the subpoenaed witness has been designated by an adverse party as an "expert" and has given an opinion on the subject matter, the witness may not be compelled to offer an opinion unless truly exceptional circumstances exist.)